Hanks vs. Harris.

Hon. E. H. ENGLISH, C. J., did not sit in this case.

---

## HANKS VS. HARRIS.

1. ASSIGNMENT: *Of decree, effect of.*
   Where one joint owner of a decree executes an instrument transferring to a third person a part of his interest therein, the legal title and right to control the decree is not thereby changed, nor does the assignee become a partner in the decree.

2. PAYMENT: *By assignment of decree.*
   Where such an assignment is intended as a mode of payment for property purchased by the assignor, its legal effect is to create a security, and the assignor's liability is not thereby extinguished.

3. GUARANTY: *In the assignment of a decree.*
   By guarantying payment to the assignee of the sum transferred, the assignor in legal effect warranted that he had a valid decree which, with good faith and reasonable diligence on the part of the assignee, would be effectual to the payment of the assignor's indebtedness.

4. PLEADING: AMENDMENT: *When presumed.*
   When the covenant sued on is set out in the complaint, this court will not consider a defect in the assignment of breaches where no objection was made to the introduction of testimony in the court below on that ground, but if the proof shows a breach, will regard the complaint as having been amended to correspond with it.

5. VERDICT: *Where general finding sufficient.*
   Where the bill of exceptions shows a fact to have been proven, this court will not reverse because a general verdict and judgment failed to state specifically that the fact was found.

6. CONTRACTS: *When the courts will not relieve against.*
   If the terms of his contract render a party liable for a result produced by the war, the courts cannot relieve against it.

7. VIS MAJOR: *Failure to issue process during the war excused.*
   Parties will not be held responsible for a failure to issue process on a decree during the time the courts were closed by the war; and the courts will take judicial notice of that period.

APPEAL from *Phillips* Circuit Court.

Hon. M. L. STEPHENSON, Circuit Judge.

*Garland, English and Tappan & Hornor,* for appellant.

*Charles W. Adams, contra.*

WILLIAMS, Sp. J.    This was an action of covenant brought in accordance with the common law forms prevalent before the adoption of the Code, on the 10th of July, 1867, upon the following agreement, to wit : This article of agreement and transfer, made and entered into this fourteenth (14) day of November, A. D. 1861, by and between James M. Hanks and Martha J. Harris, both of the county of Phillips and state of Arkansas, witnesseth, that for and in consideration that the said Martha J. Harris has sold, and by her deed of this date, conveyed unto the said James M. Hanks the following described lots, lying and being situated in the city of Helena, county of Phillips, and state of Arkansas [here follows a description of the lots], and has also sold and delivered to said Hanks divers articles of household and kitchen furniture, and delivered to him the possession of said lots and premises for the sum and price of three thousand, nine hundred dollars, the said James M. Hanks doth hereby most fully, amply, and entirely assign, transfer and make over unto the said Martha J. Harris,

and to her heirs and legal representatives, three thousand, nine hundred dollars of his interest in a certain decree recovered by Charles W. Adams and the said James M. Hanks, partners as attorneys at law, in the circuit court of Chicot county, in the state of Arkansas, on the chancery side thereof, on the sixteenth day of October, A. D. 1861, in a certain cause then in said court pending, in which said Adams and Hanks, as partners as aforesaid, were complainants, and the mayor and council of the city of Helena, and John Anderson Craig, and Joshua M. Craig were defendants, and which decree in said court was recovered and obtained by said Adams and Hanks against the said John Anderson Craig and Joshua M. Craig, two of said defendants, for the sum of twelve thousand, seven hundred and sixty-one dollars and seventeen cents, and interest thereon, from the rendition of said decree until paid, at the rate of six per centum per annum; and this assignment and transfer shall, as to every particular, have and be construed to have full effect as if made and executed upon the day of the rendition of said decree, and the interest upon said portion of, or interest in said decree shall also carry with it the proper proportion of the interest as aforesaid, from the rendition of said decree until paid, and the said James M. Hanks doth hereby covenant, promise and agree to and with the said Martha J. Harris, her heirs and legal representatives, that he is justly and legally entitled to the one full third part of said decree, by virtue of the partnership aforesaid, and doth guaranty the payment to her out of the same, the said sum of three thousand, nine hundred dollars, and interest as aforesaid; and the said James M. Hanks doth further hereby promise, covenant and agree to and with the said Martha J. Harris and her heirs, that he has in no wise incumbered or assigned or transferred his said interest in said decree, and that his heirs nor legal representatives shall, and that he will not, at any

future time, in any wise incumber, assign or tranfer (or seek to do so) his said interest in said decree, or to the said sum of three thousand, nine hundred dollars and interest as aforesaid ; and neither he or his legal representatives will or shall, at any time, seek to defeat, or in any way delay the payment to her or her legal representatives of the same, or any part thereof. And that all proper and legal proceedings may be used for the collection and payment to her of the same, free from any let or hindrance from him or his legal representatives, subject only to the right and interests of the said Charles W. Adams, as partner as aforesaid, whose interest in said decree is two-thirds thereof, and when necessary make and execute any further or proper transfer or assurance which may be legally or equitably sufficient fully to secure to the said Martha J. Harris and her legal representatives, the full and unimpaired right to collect and receive, out of the said decree, the said sum of three thousand, nine hundred dollars and interest as aforesaid. In testimony, etc.

This covenant was signed and sealed by Hanks, and was dated November 14, 1861.

It thus seems that this transfer occurred in November, after the decree was rendered in October.

It has been contended here for Mrs. Harris, that the decree, having been rendered during the war, was void. On the other hand, the attorneys of Hanks contend that the recital in the agreement evidently should have been 1860, and not 1861, because the decree is not in the record, and the evidence shows that the original compromise decree in the Junius Craig Will Case was rendered in April, 1860 ; and the testimony of Pike, as well as the final decree on the review of this compromise decree, shows that the bill to annul and recall the decree was filed in 1860, therefore, this must be a misrecital.

In the first place, the carefully drawn agreement, prepared two days short of one month after the decree was stated to have been rendered, is too near the time of execution to have reasonably escaped attention.

There is enough in the record to show, that in a litigation in Chicot county, the will and estate of Junius W. Craig was involved; that in April, 1860, there was had a compromise, in which, what was called the compromise decree was rendered, by which the Craigs became bound to pay the city of Helena $150,000; that this decree of Adams and Hanks was rendered, as recited in the covenant, in a suit against Helena and the Craigs; and it otherwise appears that the suit was to enforce Adams and Hanks' lien against the fund due Helena, as attorneys of Helena in the Craig Will Case. It would take a little time, after the compromise decree was rendered in 1860, to get up a lawsuit and ripen it into a decree in chancery. We therefore find nothing in the record to sustain the assertion that the recital of the agreement, that the decree was rendered on the 16th of October, 1861, is false; on the contrary, we find much in the record tending to the inference that it is true for what it is worth. He who would contradict his own solemn recitals should bring more than an argument in a brief of counsel in this court to contradict it, especially, when he has testified in the cause and failed to correct it.

We had as well here construe the significance of this covenant, and the scope of the duties, liabilities, rights and responsibilities of the parties, as far as material to the decision of the question involved. Adams and Hanks were partners and joint owners of this decree, Adams having two-thirds, Hanks one-third. Hanks, by this covenant, acknowledges himself Mrs. Harris' debtor for value. He attempts to carve out, and transfer to her, as a mode of payment, $3,900; thus

leaving the legal title to the whole decree as it stood, in Hanks and Adams, for the transfer only gave Mrs. Harris an equitable right. Adams thus had in this decree about $8,280 and some cents, Mrs. Harris an equitable right to $3,900, and Hanks still retained about $380. The transfer did not make Mrs. Harris a partner with Adams and Hanks in the decree, or change the legal right to the control of it, jointly or severally, for their own interest; and while Mrs. Harris was bound in good faith and diligence on her part to secure the collection of the decree, if there was a decree, yet, if Hanks had seen proper to have interfered, she would have had no remedy at law, except for breach of covenant; and could not have invoked the jurisdiction of equity, except upon showing, by reason of Hanks' insolvency, or like facts, her remedy at law was inadequate, unless, perhaps in this case, the covenant might be so construed as to make Hanks a trustee for her; otherwise, she would have been without equitable relief.

For if there is no trust or peculiar equity in the fund, or other circumstances authorizing the interposition of equity, she would have been left to her remedy at law. Story's Eq., secs. 718–738.

We cite this to show how completely this was a matter of legal indebtedness on the part of Hanks, and how little his covenants really changed his legal obligation to pay the purchase money for the property he bought, which was his own debt, and for which he was personally liable. Hanks, by this covenant, guarantied the payment of this decree. He thereby warranted that he had a decree, valid, legal and binding, against the Craigs, and that this decree, with good faith and reasonable diligence on the part of Mrs. Harris, would be effectual to the payment of the debt of Hanks to her. This guaranty was not conditional, but absolute as a warranty of title and payment.

Hanks pleaded general performance. Mrs. Harris, at the May term, 1869, filed a supplement to her complaint, alleging, for further breach of the covenant, that the decree in the covenant specified had been by the decree of the Chicot circuit court, at the October term, 1866, annulled, set aside and held for naught, and said Craigs therefrom discharged, and nothing had been paid plaintiff except $260.67, on the 15th of February, 1866. Hanks answered this, setting up, that he was not a party to this suit, nor entered his appearance. That before the annulling decree was rendered, Adams, as the attorney of the plaintiff, compromised and compounded the original decree with Joshua M. Craig, and agreed to accept for plaintiff, in satisfaction of her interest in the decree, $3,800; and that, in confirmation thereof, she received various sums, amounting to $1,029.67, and part of it after the annulling decree was entered.

At the November term, 1870, plaintiff filed a second supplement to her complaint, in which she alleges, in substance, that after making of the covenant, John A. Craig, one of the defendants in the original decree, died, and an administrator was appointed, etc.; and that Adams and Hanks, nor either of them, procured the decree to be allowed against his estate; that since the commencement of this suit, and on the 29th of February, 1868, Joshua M. Craig, upon his own application, was adjudged a bankrupt, and on the 5th of May was discharged.

Hanks answers this supplement, and admits that the decree was not presented for allowance against the estate of John A. Craig, but states that the sole reason why it was not presented was, that on the 2d of February, 1866, Adams, who was acting for himself and as agent for Mrs. Harris, inclosed in a letter to him a transcript of the decree, sworn to, and requested him to present it to the administrator of John A. Craig for

allowance, but on the next day, wrote defendant that he had compromised the decree with Joshua M. Craig, and not to present the claim for allowance. Admits Joshua M. Craig's bankruptcy, but avers that before he filed his petition, Adams, acting for himself and as agent for plaintiff, and without authority from defendant, compromised the decree with said Craig, and took in settlement among others a note to himself for the use of plaintiff, which was not presented against the estate of Craig in bankruptcy, because Adams, acting for plaintiff, agreed with Craig that in consideration he (Craig) would pay the debt after discharge, he (Adams) would not prove the claim or oppose his discharge; that Adams brought suit on this note in the Chicot circuit court, and it was settled and paid. Upon these pleadings with the original declaration, the cause was tried.

Hanks argues here, that we cannot take into account the ultimate insolvency of Craig, which is abundantly proved, because there is no such breach specifically assigned. We have not looked to see whether the specific breaches assigned are broad enough, as no objection was made in the court below to the introduction of testimony on this ground; if it had been done, the pleadings might have been amended to conform to the truth. We shall not stop to consider it here, for the first time, where the covenant is fully set out, if the proof shows a breach. We will regard that as being done which the law permitted — the amendment of the allegations to correspond with the proof.

It is also argued that the fact of ultimate insolvency cannot be considered, because the court does not specifically find the fact. When, as in this case, the bill of exceptions shows a fact to be proven, we will not reverse the general verdict and judgment of the court below, because it failed to state specifically that the fact was found. Hanks contends further, that

Craig's insolvency was the result of the war, for which he was not responsible. To this it is sufficient to say that Mrs. Harris is not responsible for it either, and parties who contract must take the results and bear the losses it brought as they may fall, and we cannot warp the contracts of parties so as to relieve them of its consequences.

It is argued, further, that Joshua M. Craig's insolvency did not exist at the date of the contract in 1861, and that Mrs. Harris should have collected it while he was solvent. It is too well settled now to need argument, that the courts being closed during the war, no process could be issued or required, and the effects of the war have been carried to the extent in special cases of excusing demand and notice of nonpayment of bills and notes, so as to charge ordinary indorsers. The court will judicially know that from 1861, the date of this covenant, until 1866, Mrs. Harris could not have enforced this decree, if it had been ever so valid. In 1866, Joshua M. Craig is proven to be hopelessly insolvent, and ultimately is declared and discharged as a bankrupt, although the bankruptcy could not of itself in this case be regarded as a cause of action, having occurred after suit brought at law. A purely supplemental fact will not constitute or perfect a cause of action brought as this was, if prematurely brought; yet, Hanks having answered it without objection, and admitted the evidence without exception, we will regard it here, to the extent to which it was admissible, under the original pleading in connection with the other evidence, to prove insolvency and its ultimately hopeless results, whereby it was rendered utterly impossible ever to collect the decree by legal coercion.

Under his covenant, it was the duty of Hanks to have probated the decree against the estate of John A. Craig, and against the bankrupt estate of Joshua M. Craig, or to have furnished a copy properly sworn to Mrs. Harris, to enable her to

do so.   For she, as the equitable owner, could not have proven part of a decree, when the legal title as well as the principal interest was in others.   This duty was required of Hanks by the terms of his guaranty, and especially by the very last clause in his covenant.

Hanks' answer shows that he contributed to the loss, if any, by failure to probate the decree against the estate of John Anderson Craig.   He admits the decree was sent to him, sworn to by Adams, for the purpose of presentation to the administrator ; but states that he did not present it, because Adams wrote him that he had compromised the decree with Joshua M. Craig.   This answer of Hanks tends to establish three facts :

1. That he was willing to entrust the entire matter to Adams — judging him by his acts — who was a part owner of the decree, with whom, Hanks states in his testimony, the matter of winding up their old business was left.

2. That Hanks had early knowledge of the compromise and acquiesced in it by silence and actions.

3. That he is directly responsible for the loss of the decree against John Anderson Craig's estate, if indeed the decree was valid against it.

It is contended by Hanks that Adams' compromise was had in behalf of himself, and as agent for Mrs. Harris.   The proof tending to sustain this, if any, is slight ; upon this the witness Adams, who acted in the matter, swears positively that he was acting to protect his own interest, which was the greater, and incidentally for Mrs. Harris, simply as a friend, and without any authority or subsequent ratification by her.   But conceding all that is claimed for the effect of what is called Adams' novation of the contract, what does it amount to ? The evidence of Mangum and Adams; and even Hanks' own statement excusing his inattention to the matter, on the

ground that he did not consider himself bound by his agreement, further than to see that he did not hinder Mrs. Harris in the collecting of it, and that he did not specially object to the compromise for that reason, and that Adams, with his permission and tacit consent, attended to the winding up of all the affairs of their old partnership, and his answer, all tend strongly to prove that Hanks was bound by Adams' acts as fully as Mrs. Harris was.

In so far as the verdict of the court may depend upon these facts, we shall not disturb it, because there may be some evidence in Hanks' statement of opposite tendency; we would not disturb it even if the weight of evidence in our judgment were the other way.

The proof is convincing that but for Adams' extraordinary exertions in his own behalf; and Pike's personal influence over his client Craig, added in furtherance of Adams' effort, not one dollar would have been collected for himself or Mrs. Harris. But by this extraordinary exertion, Adams saved several hundred dollars, which were paid Mrs. Harris on the covenant of Hanks, and for which he got credit on the trial.

To say that these acts so performed by Adams, under Hanks' eye, and without a word of remonstrance or objection, until all is lost except the little Adams saved from the wreck, shall be called a novation of the contract, to Hanks' prejudice, and be all visited upon the head of Mrs. Harris, it seems to us would be a mockery of that justice which we are here to administer. To such a conclusion we cannot give our assent. Hanks, in his deposition, in attempting to show that he did not approve of the compromise, closes with this sentence: "The truth is, my remaining interest in the decree, after my assignment to plaintiff of $3,900, was so small I thought nothing of it, and felt that I had no more to do with it." This sentence may contain the keynote to Hanks' whole

conduct, but if that be even true, and we give him the fullest credit for sincerity, we cannot excuse him for a misconstruction of his covenant, nor can we visit upon Mrs. Harris an ultimate loss, which the proof shows that no diligence could have prevented, and which Hanks does not pretend to claim could have been prevented. He tries to explain what he understood the covenant to mean — which was, that he sold Mrs. Harris chances of collecting $3,900, for her property. The covenant is not doubtful, and explains itself, and we are bound by its terms in our construction of it, as Hanks is in his duty to his creditor. Our construction of it is given on its face alone, and no parol evidence can be heard to explain or modify it. As a further proof of Adams' power over the old partnership business, Hanks says in his deposition: "I have never regarded the partnership as existing since the war, and turned all the books and papers over to Adams." This turning over would have been very useless if it had not involved the power to act in reference to the matters "turned." We have construed Hanks' covenant as warranting the existence and legal validity of the decree, in which he assigns, equitably, a part interest, and was a covenanting guaranty. The compromise decree in the Craig Will Case is not before us. Pike, whose testimony in that regard was admitted without objection, testifies that it was rendered in April, 1860, in a cause in which said Sandford C. Faulkner and wife and others were complainants, and the executors of the will of Junius W. Craig and his heirs and the city of Helena and others, legatees, were defendants. That after the compromise decree, Joshua M. Craig, who had become liable to the city of Helena, and to Edward J. Wright, for a large amount, and given his and John A. Craig's notes for the same, had cause to think that the decree was a nullity and in such shape that if he paid the money which he had assumed, he would obtain

no title to the property. Pike gave him his opinion to that effect, and he employed Pike to file a bill to "recall and cancel the decree." The bill was filed for that purpose to the April term, 1861, making Helena a defendant, also Charles W. Adams, who was the attorney of Helena in the original suit and drew the decree, and had received for his fee one or more of the notes given under the decree by Joshua M. Craig and John A. Craig, to the city of Helena. This suit slumbered on the records until the close of the war, when John A. Craig having died, Pike filed a supplemental bill in behalf of Joshua M. This suit resulting in a decree annulling the former compromise decree of April, 1860, for the benefit and behalf of Joshua M. Craig and the estate of John A. Craig. The decree is in the record in this cause and is far reaching and full, the defendants being the heirs and legatees of Junius W. Craig, Emma J. Wright as executrix and William P. Halliday as executor of his will, the city of Helena, Charles W. Adams and others. Hanks was not a party. The decree pronounces the notes given to the city of Helena, upon which Adams and Hanks' decree was founded, without consideration, null and void, and annulled the compromise decree with all its dependents and incidents, and the verdicts and judgments at law based thereon, etc., and that the same be taken "and held as though never made," and the city of Helena and all other defendants and persons claiming under them were perpetually "enjoined from in any manner availing themselves thereof, in any suit, proceeding or controversy or matter whatsoever."

Hanks claims that he is not bound by this decree, because he is not a party. Conceding this, which we do not, still Adams was bound. No process could have been issued without throwing him in contempt of the court, and although Hanks' counsel contends here that Mrs. Harris might have issued an ex-

·ecution on the decree for her $3,900, we do not suppose they were serious in this, for even if an execution could have been issued as they claim for a part, it still must have been in the name of Adams and Hanks. So the decree was practically dead.

In a review of authorities in the case of *Harrison v. Trader and wife, ante,* p. 85, we showed that on bills to cancel decrees like this, the matter was regarded as *lis pendens,* from the beginning of the original suit, and all intermediate purchasers with notice were fully affected and bound by the decree, which was finally annulled. If this were not the rule, all that it would be necessary to avoid would be an adverse shifting of title. The following authorities fully sustain us in holding Hanks bound by the decree, if not as a privy in fact, under the city of Helena, at least as a purchaser *pendente lite. Earl v. Couch,* 3 Metc., 450; *Clay v. Marshall's Heirs,* 4 Dana (Ky.), 95; *Debrell v. Foxworthy,* 9 B. Mon., 228; 2 Dana (Ky.), 406; Story's Eq. Pl., sec. 156.

It would be difficult for us to say that Hanks, who was one of the attorneys in the original suit, and whose firm, the proof shows, drew the answer of the city, is not affected with notice of the source of his title when in the case of *Earle v. Couch,* above cited, the supreme court of Kentucky held that a relative of such attorney, who bought from him, was affected. We therefore hold, that the annulling decree destroyed the original decree with all its incidents and related back, in its effects, if not to the beginning, at least, to the commencement of the suit and review in April, 1861. Therefore Hanks' covenant was legally false when made in November 1861, reciting a decree in October 1861, and was broken at once and there was a right of action. *Logan v. Moulder,* 1 Ark., 322.

Hanks' covenant was that he had a valid decree. His decree ·was an incident of, and dependent upon the original compro-

mise decree.    The effect of the decree in favor of Adams and
Hanks was to subrogate them *pro tanto* to the rights of the city
of Helena, against the Craigs in the compromise decree.    That
decree being annulled, of course, swept Hanks' incidental de-
cretal offshoot with it, and left him standing simply a debtor
to Mrs. Harris, upon a sealed covenant and guaranty.

But if we are mistaken in this, still it is evident, that the
decree is not of continued effect, and could not result in ulti-
mate payment, which is a sufficient breach of the covenant to
sustain the verdict and judgment, if Hanks failed to pay when
such facts transpired.

In the crompromise made at Memphis, in February 1866
between Adams and Joshua M. Craig, which Hanks claims as
a novation of the contract which 'released him, it appears that
Adams, after the war, and the legal solvency of Craig became
doubtful, and his inability to pay the whole decree became
manifest, had gotten Craig to agree to pay $8,800 — of this he
paid $800 in cash, one-third of which was paid to Mrs Harris,
and for the balance, had taken notes, due at different periods, to
himself for his own use, amounting with his two-thirds of
the last payment to $5,000; and had taken one of the notes
payable to himself, for the use of Mrs. Harris, for a sum which
with her one-third of the last payment equalled $3,800—,
which latter sum Adams, not having the covenant before him,
thought was the real amount due Mrs. Harris.    Craig after-
wards made some payments to Adams, one-third of which was
placed to Hanks' credit on his covenant with Mrs Harris.

Although Hanks says his conversation with Mangum must
have referred to another matter, we are strongly impressed,
that it was of this compromise, that Mangum testifies that Hanks
said : "We were more fortunate than Hanly in getting our fee in
the Craig Will Case; we secured a part of our fee by compro-
mise." It is of this Adams testifies, when he says Hanks, in

his interview with him shortly afterwards and while Craig was at Memphis, and the compromise could have been undone and recalled, unequivocally approved it. It was of this Adams wrote to Hanks, which the latter gives as his reason for not presenting the claim to the administrator of John A. Craig.

It is proven by Adams, also, that Mrs Harris never saw the note he took for her use in the compromise, and when he paid her the $267, the third of the $800 cash, she received it, but said she did not want to do any thing which would release Hanks. The proof tends to show that the compromise was entered into by Craig, through Pike's influence over him; that after the bankruptcy, some of the compromise notes, amounting to the greater part of the debt, remained unpaid. Through Pike's influence and Adams' exertions, a new promise was gotten, on which Adams sued in the Chicot circuit court and got judgment, after Craig's bankruptcy, but realized nothing out of it. The testimony tends to prove, that Joshua M. Craig's bankrupt estate was worthless, and would not have paid the expenses of establishing the compromise notes against it.

Adams owns that he acted for the firm in the original compromise as he did in other matters; that he had collected and paid his part of other fees to Hanks. Finally, realizing nothing on his judgment against Craig, he accepted from him, in full discharge, a deed for a piece of land in Chicot county of uncertain value. This land was incumbered with taxes and a lien due Carlton. Adams has never received anything on it. Adams offered to share this land with Hanks, and asked him to divide the expenses and to help pay the claims off. Hanks refused and testifies himself, that Adams asked him if he renounced it; he replied "Yes." Adams then told him to remember this. As this occurred after the breach of Hanks' covenant, when Mrs. Harris had a complete right of action against him, and while this suit was pending, it is difficult to

say how the private transactions of Adams and Hanks could take it away or impair her rights, unless Hanks can bring home to her some act which has injured him, or show that she has realized money for which he is entitled to credit. Even then, this suit having been commenced of right, he must pay cost. Mrs. Harris is in no way a party to this land transaction. Adams, who alone could really fully know, swears he was acting for himself, and to secure his own interest.

As Hanks interposes no claim and introduces no proof of value, it would not be considered as an accord and satisfaction, and in the light of a novation, we have already discarded that, for the original liability was Hanks.' The assignment of the decree was a security or mode of procuring payment, and nothing but bad faith or gross negligence on Mrs. Harris' part could excuse him.

There were a number of propositions of law asked on the part of each party ; some were given and some refused. Appellant made this action the ground of exception during the progress of the trial, and the court having rendered a verdict against him, he moved the court for a new trial, making this action of the court special grounds. This motion was overruled. There were seven causes assigned in the motion, but as we have fully reviewed the case, we shall not take the declarations of law or the ground assigned for new trial specially into consideration. We are satisfied that the court acted under no serious misapprehension of the law governing the case, and on the whole record before us, the same verdict and judgment should be rendered again, if we should grant a new trial for abstract or immaterial errors. The court below therefore properly overruled appellant's motion for a new trial.

Let the judgment be affirmed.

Hon. E. H. ENGLISH, C. J., did not sit in this case.