## RAILWAY COMPANY *v.* HAMMOND.

### Opinion delivered January 6, 1894.

1. *Master and servant—Rules.*

   The reasonableness of a rule adopted by a railroad company for protection of its employees is purely a question of law, and not of fact.

2. *Instruction—Negligence.*

   An instruction, in an action against a railroad company for the negligent killing of plaintiff's intestate, which charges that if the jury find that deceased "was killed by any of the alleged wrongful acts, negligence or default of" defendant company, they will find for the plaintiff, is erroneous if any one of the several acts of negligence alleged in the complaint, if proved, would not justify a recovery.

3. *Railway—Duty to give notice of trains.*

   A railroad company, which maintains a rock quarry alongside its track is not guilty of negligence in failing to give the foreman in charge of the quarry notice of the approach of a train running on irregular time.

4. *Negligence—Failure to sound whistle.*

   An engineer in charge of an extra freight train is not guilty of negligence in not sounding the whistle or giving other notice of his approach to a rock quarry where men were at work, if the rules and regulations of the railway company did not require him to do so.

5. *Instruction—Risk assumed by servant.*

An instruction, in an action against a railroad company for the death of an employee, which charges, in effect, that defendant would be liable if its foreman in charge of laborers at a quarry required deceased, one of such laborers, to be on the railroad track on a hand-car at a time when, being young and inexperienced, he was exposed to the danger of a collision with a train running on irregular time, is erroneous where that was part of the work deceased was employed to do, and understood the nature of the risk.

6. *Whether a foreman is a vice-principal.*

Whether the foreman in charge of laborers at the quarry was, under the circumstances of this case, acting as a vice-principal is a question of fact for the jury.

Appeal from Fulton Circuit Court.

JOHN H. WOODS, Special Judge.

Action by Hammond, as administrator of Geo. C. Golden, deceased, against the Kansas City, Fort Scott & Memphis Railway Company.   The facts are stated by the court as follows:—

The appellee, administrator, as plaintiff, instituted this action in the Fulton circuit court to recover of appellant company, as defendant, damages in the sum of $5000, for the negligent killing of George C. Golden, his intestate, for the use and benefit of James O. Golden, father of and next of kin to deceased.   Verdict for $1300. Motion for new trial made and overruled.   Exceptions taken.   Appeal taken, and bill of exceptions tendered and certified.

The complaint, omitting merely formal part and description of parties, is as follows, to-wit:  " That on the day and year aforesaid, (31st May 1889,) the said George C. Golden, in the line of his employment, and under the direction of the agent, who was in charge of said rock quarry, was on board of a hand-car, proceeding from said rock quarry, over the defendant company's railroad, to the station of Ravenden, in Lawrence county, Arkansas, when said Golden was, by the negligence of

defendant and its servants, run over by a freight train running on said defendant company's railroad, and, without fault or negligence on his part, then and there killed. And plaintiff avers that the death of said Golden was. caused by the negligence of defendant company, its servants and employees, in this : (1) The said freight train was a special or extra train, not running on the time of any regular train, and that the agents of defendant company, whose duty it was to regulate the running and time of all trains, were guilty of negligence in not informing the agent of the company in charge of said quarry when said train would pass the quarry. (2) The engineer in charge of said train neglected to sound the whistle or give the usual and necessary notice of the approach of said train to said rock quarry ; and that if said notice had been given, the plaintiff's intestate would have heard it, and have been thereby enabled to get off the track and avoid the danger of said train. (3) The company's foreman in charge of said rock quarry was guilty of gross negligence in requiring or procuring said deceased to be on the railroad track at that time when he was exposed to the danger of trains running on irregular time ; he, the said plaintiff, being young, and wholly inexperienced in all matters pertaining to the running of trains or railroads ; and plaintiff alleges that said killing was without fault of said intestate, and could not have been prevented by him.   That said decedent, George C. Golden, was unmarried, and left, him surviving, as his sole heir at law, his father, James O. Golden, a resident of Fulton county, Arkansas, who is about 57 years of age, and is, and was at the date of his said son's death, in feeble health. That said James O. Golden, with his wife, the mother of said deceased, Rebecca Golden, who is fifty-two years of age and an invalid, was wholly dependent upon said decedent for a support and maintainance, and for such

care and attention as the parent's situation in life needed and required, he residing with them, and that, by reason of the death of said decedent, said James O. Golden has been damaged in the sum of $5000. Wherefore, plaintiff prays judgment for said sum of $5000, and for other relief."

The defendant, answering, specifically denied each of the material allegations, and further denied that it was the duty of the defendant, its agents or servants, to notify the agent in charge of the quarry of the passage of the extra freight train; that the engineer in charge of the extra train neglected to sound the whistle or to give the usual signal of the approach of his train to the quarry, and that it was his duty to give such notice on his approach to said quarry, and that, if said notice had been given, plaintiff's intestate would have heard it, and therefore been enabled to get off the track, on the approach of the train, so as to avoid being killed thereby; that the foreman in charge of quarry was guilty of gross negligence, or any negligence, in requiring or having deceased to get on said hand-car, or that he was exposed to any danger by being thereon, from the running of any trains. And further defendant alleges that if deceased came to his death by the negligence of the engineer or any of the trainmen on the freight train, or of any of the men on the hand-car at the time of the accident, then, in either case, all being but fellow servants of deceased, the plaintiff could not recover; that deceased came to his death by and through his own contributory negligence in negligently jumping backwards and alighting in front of the hand-car then in motion.

The deceased, Geo. C. Golden, about three days before his death, was employed by James Sellers, the defendant company's foreman, as one of the hands to work under him at the company's rock quarry, on its railroad, about two and one half miles east of Ravenden,

a depot on its road, and the nearest telegraph station to the quarry. Sellers had authority, or exercised the authority, to employ and discharge hands at his pleasure. R. J. and A. K. Welsh, 24 and 22 years of age, respectively, were employed by him about the same time as was Golden, who was about 21 years old. Golden is not shown to have had any experience in the line of that employment, nor in railroading. Neither is it shown very satisfactorily that he was without experience. He was reared as a farmer's boy, but had worked two years at saw-milling, and is shown to have been a stout young man, and a good hand to work, and devoted a portion of his earnings to the support of his father, 57 years old, and his mother, 52 years old, both feeble and unable to support themselves, being without means and without any real estate. The plaintiff is shown to have been duly appointed and qualified as administrator of the estate of the deceased.

On the 31st day of May, 1889, at the request of their foreman, Sellers, the deceased and the Welsh brothers boarded a hand-car standing on the track at the quarry, with the foreman, and started for Ravenden, for the purpose of enabling the foreman to make report to higher officials of the railroad as to number of cars that were loaded at the quarry and ready to be taken out by a subsequent train.

The three young men were merely engaged in propelling the hand-car by working the lever; the Welsh brothers being on the rear end and looking forward, and Golden on the front end looking backward. At first the foreman stood on front end with Golden, and while there, warned him to keep a lookout as an extra train might come along at any time, as he said. Such was his testimony, although nothing was said of this by the Welsh brothers in their testimony.

When they had proceeded about one-half or three-fourths of a mile from the quarry, (at what speed it is not shown,) and after passing around a curve in the road, occasioned by a hill, and while on the farther end of the curve, they were seemingly thrown into a state of excitement, by the sounding of a whistle of the engine of an extra freight train of twenty-five or thirty cars, and running at the rate of twenty or twenty-five miles an hour, and approaching from the rear of the hand-car. The foreman immediately ordered the brakes to be put on, and this was at once done by the Welsh brothers, and then they both jumped off as did the foreman, one of the Welshes to the one side and the other and the foreman to the other, while Golden either jumped or fell off backwards in the middle of the track with his face upwards, and the hand-car then but slowly moving passed over him, and he, probably in his fright, catching hold of the front end, held on with such tenacity that the foreman, with all his efforts, could not release him from the hand-car. In this condition and situation, the train, with speed then reduced to fourteen or fifteen miles an hour, struck the hand-car, knocked it off the track, and passed over Golden its entire length, killing him instantly.

Between the time the whistle was sounded and the collision, the hand-car had moved about sixty-five feet, and the train had gone between 500 and 600 feet in addition, it being about that distance from the hand-car when the whistle sounded.

The testimony of foreman Sellers, testifying for defendant company, is to the effect that Golden, from his position, looking back towards the approaching train, should have seen it at a distance of 1000 feet, had he kept a proper lookout. The testimony of Anderson, the engineer on the freight train, testifying for defendant also, is to the effect that, being at his post in the cab of

.the engine, as soon as he saw the hand-car he blew the whistle, and sounded "down brakes" time and again, and as rapidly as he could to be understood.

Other matters in evidence will be referred to in the opinion, should occasion demand such reference.

*Wallace Pratt* and *Olden & Orr* for appellant.

1. The allegations of the complaint do not constitute negligence. There was no rule of the company requiring the whistle to sound in passing a quarry, and it was not negligence in the company to fail to make such a rule or regulation. 52 N. W. Rep. 153; 7 S. E. Rep. 119; Patterson, Ry. Ac. Law, p. 160; 109 U. S. 477–485; 19 S. W. Rep. 38. There was no crossing at the quarry.

2. If defendant is liable at all, it must be for negligence committed at the time, and not for what it might have done, and the result of such probable acts upon the deceased. 11 N. W. Rep. 24; 2 Pac. Rep. 748; 2 N. E. Rep. 185.

3. Golden was fully instructed as to his duties by the foreman. When a youth of sufficient intelligence, or a person of inexperience, enters the service of another, and his duties are fully explained to him, he then assumes all risks incident to that service. 13 N. W. Rep. 819; 19 S. W. Rep. 600; 53 Ark. 117; 39 *id.* 17.

4. The acts of negligence stated in the complaint had no casual connection with the act of deceased in jumping from the hand-car, and were not the proximate cause of the injury. The injury was caused by his own negligence. 36 Ark. 41, 371; 40 *id.* 298; 41 *id.* 382; 44 *id.* 293; 95 U. S. 615.

5. A railroad company is not liable to an employee for injury occasioned by the negligence of a fellow-servant. The engineer of the train and the foreman of the gang were fellow-servants of the deceased. 42 Ark. 417; 39 *id.* 17; 35 *id.* 417; 46 *id.* 555; 51 *id.* 567. Wood on Master and Servant, 990.

6.  Golden, after being notified, assumed all risks. 60 Md. 395; 51 *id.* 47; 41 *id.* 298; 14 R. I. 357; 38 Minn. 117; 21 A. & E. R. Cas. 535; 112 Mo. 223; 66 Mich. 277.

*Sam'l H. Davidson* and *Robert Neill* for appellee.

1.  The foreman of the quarry gang was a vice-principal. He was placed at an isolated place between stations, with no telegraphic or other communication. He had full charge of the work—had authority to employ and discharge hands. It was his business to put out danger signals. If he had done so, the accident would not have happened. He represented the company, and his negligence was the company's negligence. It was negligence not to have a rule requiring trains to sound an alarm at the quarry, and it was negligence in the foreman not to have trains warned that a hand-car was in front on the road.

2.  The complaint should be treated as amended to conform to the proof. 29 Ark. 323; 40 *id.* 352; 54 *id.* 289.

3.  The law imposes on railroads the duty of establishing and *enforcing* regulations necessary to protect employees. 54 Ark. 289; 112 U. S. 377.

4.  The quarry foreman was a vice-principal.

5.  Contributory negligence is matter of defense, and must be proved. 48 Ark. 106; *Ib.* 461.

6.  It is the duty of the master to make and publish such regulations or provisions for the safety of employees as will afford them reasonable protection against the dangers incident to the performance of their duties. 112 U. S. 377; McKinney on Fellow Servants, par. 24, (d), page 62 and note 1; 31 Kas. 586.

BUNN, C. J., (after stating the facts). One of the causes of complaint of the appellee is to the effect that the appellant company had failed and neglected to

1. Reasonableness of rule adopted by master.

establish reasonably sufficient rules and regulations to govern the conduct of its business in respect to the running of trains by the rock quarry, so as to afford reasonable protection to the men there employed, and while on the hand-car, as deceased was when killed.

This is a charge of direct negligence on the part of the company, and of itself involves no question of agency or relation or degree of service, for it is not to be thought of that rules and regulations, as here understood, are other than immediate directions of the master.

It is conceded everywhere that, in order to insure, as far as practicable, order and system in a dangerous and complicated business like that of railroading, it is the duty of the company to establish rules and regulations reasonably conducive to that end, not alone because its business may prosper the more, in that its conduct is thus made the more orderly and systematic, as it must necessarily do, but because another, and none the less important, effect of such reasonable rules and regulations must necessarily be to add to the safety and security of the company's employees engaged in the labor which the business demands.

Further than this, as was said by this court in the case of *Railway Company* v. *Triplett*, 54 Ark. 299–300 : "This seems to be the general rule of law, when the circumstances are such that a reasonably prudent person might rely upon rules and regulations to afford protection. But if the master sees proper to rely upon such methods of protection to his servants, and the occasion demands it, he should also adopt such measures as may be reasonably necessary to secure the observance of such rules." In many jurisdictions the duty of seeing that the rules and regulations are enforced is expressed in stronger terms, but this court has never gone further than is indicated in the above extract.

It will be seen that the objection to the insufficiency of the rules of the company was confined to an allegation that, if the rules had been such as to require of the engineer of the freight train to sound his whistle on his approach to the quarry, it would have been sufficient, in this, that the men on the hand-car, a half mile or three-fourths of a mile away, could have or would have heard it, and, being at such a distance from the approaching train, could easily have got off the track in time to avoid all danger of collision, and that thus the life of the deceased might or would have been saved.

On the other hand, it is in evidence that the rock quarry not being a regular stopping place or station of any kind, in the meaning of that term, the engineer of a passing train was not required by the rules to sound the whistle on his approach to it, unless he was signaled from the men there at work; and then he was required to sound the whistle, not to notify them of his approach, but rather as an answer to, and recognition of, their signals.

The full details of the purposes for which the men at the quarry were required or permitted to put out signals to passing trains are not set forth in evidence, as would have been more satisfactory; but this much is shown, namely, that these men were to put out the signals when there were obstructions on the track there, and these signals were a green flag, advising the engineer to slow up and get his train under his control, and a red flag, to stop. It is further stated that the signals were to be regulated by the person in charge of the quarry. We gather, also, that there was a rule of the company (whether this same one or another, we cannot determine), which required any person placing an obstruction on the track to give the necessary signals to passing trains, and also that it was the duty of one finding an obstruction on the track to give these signals

at once. In all cases, it would seem from the evidence, the signals were to be placed at stated distances from the .point of obstruction, either way, and the distances named, we infer, were thought to be sufficient to enable the engineers to stop, or get their trains under control, before reaching the point of danger.

It will thus appear that the issue made amounts to nothing more than a controversy as to the relative value and efficiency of the rule suggested by appellee, and the one in vogue by the company ; that is to say whether the engineer of the approaching train should be required by the rules to sound the whistle as a warning to those at the quarry of his coming , or that the men at the quarry should give signals to him of any cause to slow up or stop, and he should sound the whistle in response to their signals, not as a notice of his coming, but rather that he has observed and will heed the warning made by the signals at the quarry. In the one case the whistle would always be sounded ; in the other, it would be sounded only as there was any special local reason for stopping or getting the train under control.

It is said in *Railway* v. *Adcock*, 52 Ark. 406, (which was a case not unlike this one in respect to the rules and regulations of the railway company, although unlike this one in the particular object of these rules, as therein stated) that, "the facts being uncontroverted, it was the province of the court to declare the regulations reasonable. To submit the question to the jury for determination, under the circumstances, was simply to leave the matter to their discretion, which was error." That the mere reasonableness of a rule or regulation is purely a question of law, and not of fact, as announced in that case, is supported by the following : *Vedder* v. *Fellows*, 20 N. Y. 126; *Ill. Central Ry. Co.* v. *Whittemore*, 43 Ill. 420 ; and inferentially by *Hobbs* v. *Tex. & Pac. Ry. Co.* 49 Ark. 357.

. In *Ill. Central Ry. Co.* v. *Cole*, 43 Ill. *supra*, it is said, in explanation of the doctrine : "It was proper to admit testimony, as was done, but, either with or without this testimony, it was for the court to say whether the regulation was reasonable, and, therefore, obligatory upon the passengers. The necessity of holding this to be a question of law, and, therefore, within the province of the court to settle, is apparent from the consideration that it is only by so holding that fixed and permanent regulations can be established. If this question is to be left to juries, one rule would be applied by them today, and another tomorrow. In one trial a railway would be held liable, and in another, presenting the same question, not liable. Neither the companies nor passengers would know their rights or their obligations."

The rule in vogue, as shown in evidence in this case, does not in terms extend to the protection of employees passing from point to point on hand-cars while engaged in the legitimate prosecution of the company's work. Perhaps the very meagre statements of the witnesses testifying on this subject were confined to cases of obstructions at the quarry, because the minds of the witnesses were mostly directed to that point, in connection with the inquiry as to what was not the duty of the engineer of an approaching train, as to the men then at work; and perhaps a further examination of the witnesses on the subject might have discovered some additional rule. Be that as it may, the little of the rules and regulations of defendant company that was brought out in evidence does not seem to us to have any very direct bearing upon the subject of protection to employees running on hand-cars. It may be that there are none such, and it may be that special precautions in each instance and on each occasion is thought to be best. We

cannot pass any judgment on this phase of the question, since the evidence gives us no sufficient data.

On the other hand, the rule suggested by appellee as a proper one could under no circumstances possess any virtue, except in cases of persons near enough to the quarry, and the sound of the whistle there, to hear it, and yet far enough away to have more time to get off the track than they would have after the train comes in view and sounds the whistle, as is the rule in vogue, or as was done in the present case.

It is impossible to say how far or near, then, persons must be to hear the whistle in any case, and still more so, when they are on a running hand-car, in a rugged and hilly country, where the transmission of sound is obstructed and the sound itself is lost in the more immediate noise of the running car. Sounding the whistle at the quarry, or at any other point, would of course afford no protection to persons out of hearing, and yet so far from their destination as that they will be overtaken. The positive evil of the rule suggested is made apparent, for, having taken the place of a better rule, perhaps, it is nevertheless, of itself, in that case useless. The suggested rule, therefore, would only be applicable to special instances, and its application, if attempted to be extended beyond these special instances, might interfere with the application of more salutary general rules. We are unable to say that the refusal of the company to have the regulation suggested by the appellee was unreasonable. At all events, it was error to submit the question to the jury.

Leaving the subject, then, of the making and publishing of suitable rules, we come now to consider acts of negligence on the part of the company's employees, which were the proximate or contributory cause of the injury complained of.

It is too well settled to admit of discussion that a servant injured by the negligence of a mere fellow servant has no cause of action against the master. A co-servant may sometimes be guilty of negligence resulting in injury to another servant, while he is in the performance of some duty belonging to the master, and thus make the master liable ; but the rule is unbending that a master is not liable for an injury to one of his servants which has been caused by the negligence of a fellow servant, while the negligent one was acting in the sphere of his employment as such.

This being the rule, universal in its application, it is useless to discuss, in this or any other case, the negligent acts of a mere fellow servant to the deceased. We are principally, if not altogether, concerned in the inquiry as to who, connected in any manner with the accident resulting in the death of Golden, was a vice-principal, if such there was.

The rule, if, indeed, it can be called a rule, by which the relation an employee sustains to the master and to other employees may be determined in any case, is fully discussed by this court in the late case of *Bloyd* v. *Railway Co., ante* p. 66, and the authorities therein cited, and we will not attempt a further discussion of the principle, except in so far as it may bear upon its proper application in this case.

It goes without saying that railroading, in almost all of its departments and branches, is such a dangerous business as that, in order for the company to do its duty to its employees, in exercising ordinary care looking to their safety, security and protection, much of the work, by reason of its complications and number of men engaged, requires its control, direction and supervision. The master may perform his duty of supervision in person, or he may delegate it to another, in which latter case, however, he is not relieved of any of its obliga-

22

tions in case of a failure of performance on the part of his vice-principal, or middleman, any more than if the failure was his own, while acting personally in the matter.

The question as to who is a vice-principal or fellow servant, in any given case, is mostly, if not altogether, a matter of fact in the present state of the law; each case standing on its own peculiar state of facts.

The doctrine of risks assumed by one entering into the employment of another, and the non-liability of the master for injuries resulting to an employee from the carelessness and negligence of a fellow servant, is well expressed in the following statement, and we think it is sustained by all the authorities: "He who engages in the employment of another, for the performance of specified duties and services, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services. The perils arising from the carelessness and negligence of those who are in the same employment are no exceptions to the rule; and when a master uses due diligence in the selection of competent and trustworthy servants, and furnishes them with suitable means to perform the service in which he employs them, he is not answerable to one of them for an injury received by him in consequence of the carelessness of another, while both are engaged in the same service." The foregoing statement embodies the principle enunciated in *Little Rock, etc. Ry. Co.* v. *Duffey*, 35 Ark. 602.

We deem it unnecessary, in this connection, to discuss the law applicable to cases of contributory negligence, as that is so well settled as to require no other consideration than that we may give to it in discussing the instructions in this case.

2. Instruction as to negligence disapproved. The first instruction given by the court at the instance of plaintiff is in these words: "You are

instructed that the statutes of Arkansas give a right of action whenever the death of the person shall be caused by the wrongful act, neglect or default of any person, company or corporation, in the name of the ·personal representative of such deceased person, for the benefit of the next of kin of such decedent; and if you find, from the evidence, that the decedent, George C. Golden, was killed by any of the alleged wrongful acts, negligence or default of defendant company, then you will find for the plaintiff, and. assess such damages as you shall deem warranted from the whole evidence and instructions of the court, unless you further find that the deceased by his own concurring negligence contributed to his death."

There are three separate and distinct charges of negligence made specifically in the complaint, and only three. The first is that the defendant company was negligent in not informing the agent of the company in charge of the quarry when the extra freight train would pass. This allegation is, of course, based upon the objection that there was a failure to have a regulation to that effect. That question has been disposed of, against the contention of the appellee, in our discussion of the reasonableness of the rules, and conclusion thereon. <span style="float:right">3. **Duty of railway as to giving notice of trains.**</span>

The second charge of negligence in the complaint is that the engineer in charge of the extra freight train was guilty of negligence in not sounding the whistle or giving the usual notice of his approach to the quarry, thus enabling the deceased to have got off the track in time to save himself. The failing to sound the whistle without a signal .from the quarry-men was no negligence on the part of the engineer of the approaching train, as the rules and regulations did not require him to do so. Nor was he negligent in failing to give any other notice of his approach, for the same reason. Besides, it is not shown, or attempted to be shown, or contended, that the <span style="float:right">4. **As to failure of engineer to give signals.**</span>

engineer was anything else than a fellow-servant to the deceased.

5. As to risks assumed by servant.

The third charge of negligence in the complaint is that James Sellers, the foreman in charge of the rock quarry, required or procured the deceased, one of his laborers at the quarry, to be on the railroad track (on the hand-car) at the time when, being young and inexperienced, he was exposed to the danger of collision with trains running on irregular time. In the instruction immediately following this one, it is stated by the court, at the instance of plaintiff, that the placing of the deceased on the hand-car by the foreman was in the line of the foreman's business and of the employment of the deceased, or words to that effect. If that be true, there was no negligence in the foreman's placing the deceased on the hand-car for the purpose of assisting in propelling the same to Ravenden, notwithstanding his youth and inexperience; and if, on the other hand, it was not strictly in the line of his employment, yet, if he continued in this extra hazardous service after being informed of its peculiar hazard and danger, he could not complain on that account merely. After all, it does not appear that there was any extra hazard in this particular service that all men of ordinary intelligence do not fully understand, unless it be that extra trains are run on no regular schedule, and are not as capable of being regulated by rules as are regular trains. The control of the movements of this hand-car is not shown to have been any part of the work of the deceased. The question of his youth and inexperience was not in this case exactly like that question as it arises in most cases. Here his experience, if he had experience, may not have aided him to any great extent, while his inexperience had little to do with increasing the dangers of the situation. The experience of the foreman was the experience that mostly, if not alto-

gether, was expected to affect the success of the run on the hand-car. The inexperience of the deceased might have rendered him less self-possessed in the moment of danger, and the less skilled in escaping and extricating himself from danger when it was upon him, and the hazard was therefore greater than that of work he was acquainted with; but his inexperience probably had nothing to do with running the hand-car into danger, for he did not control its movements.

The first instruction was erroneous, and not only erroneous, but so much so as to be incurable by any other, since, under any state of things, we could never know, but that any verdict the jury might render was affected by its mistaken theory.

The second instruction given by the court at the instance of plaintiff is as follows, to-wit: "The jury are instructed that if they believe, from the evidence, that the plaintiff's intestate, at and prior to the date when it is alleged by the complaint that he was killed, was in the employ of defendant company; that he was hired by an agent of the company in charge of the rock-quarry in Lawrence county, as foreman thereof, to work in said rock-quarry; that said foreman was by the defendant invested with authority to employ, control and discharge men at said quarry, such control of the men and the management of their work being referred to his judgment and discretion, and not governed by detailed regulations published or made known by defendant company to both such agent and the deceased; and that said agent, within the scope of such authority, and in the performance of the duties the deceased had been so employed to perform, through negligence and want of due caution, placed said deceased in a position where he was exposed to the danger of being run over by passing trains, and he was, in consequence of such negligence of such agent or foreman, killed by a train of defendant

6. Whether a foreman is a vice-principal.

company, and without being himself negligent in the use of reasonable means to avoid the danger, then they will find for the plaintiff."

The hypothetical part of this instruction is based upon evidence going to show that the foreman of the quarry was a vice-principal, representing the master, in charge of the hands and work at the quarry, as well as in the running of the hand-car to Ravenden, stated by the court, in effect, to be a part of the quarry work. That was a legitimate question to submit to the jury. And if the jury should find facts sufficient to constitute the foreman a vice-principal, representing the company in his control and supervision of the deceased, then it was legitimate to inquire into the negligence of the foreman, which contributed to the death of deceased, whether that negligence consisted in omissions and lack of precaution, in violation of and neglect to avail himself of the rules and regulations, or in affirmative acts. But the particular act named as the act of negligence in the instruction, namely, the act of putting deceased on the hand-car at the time and under the circumstances, was no act of negligence on the part of the foreman, for that was, in the instruction, conceded to be a part of the work the deceased was employed to do. The instruction was therefore erroneous.

The fourth instruction asked by plaintiff and given by the court is not so materially wrong but that it might have been corrected by the use of apt expression upon which to predicate the idea that in an emergency one's want of presence of mind and prudence is sometimes excusable.

The fifth of these instructions is not included in the motion for new trial, and the sixth is erroneous because of its indefiniteness. It is misleading. The objection to the third does not appear to have been insisted on. We deem it unnecessary to consider the instruction

asked by defendant and refused by the court, since the judgment of the court below must be reversed for the error pointed out.

Reversed and remanded, with leave to plaintiff to amend his complaint if he so desire.

WOOD, J., dissenting.    The complaint in this case alleges "that Geo. C. Golden, in the line of his employment, and under the direction of the agent who was in charge of said rock quarry, was on board of a hand-car proceeding from said rock quarry over the defendant company's railroad to Ravenden, a station in Lawrence county, Ark., when said Golden was, *by the negligence of defendants and its servants, run over by a freight train running on said defendant company's railroad, and, without fault or negligence on his part, then and there killed.*"    Thus it would stand, omitting the formal parts and the three separate assignments setting forth the specific acts of negligence.    The company, without in any manner objecting to the complaint, answers, and "*denies that said deceased Geo. C. Golden was run over and killed by or through the negligent acts of defendant or its servants;*" then denying specifically the several assignments of negligence as alleged in the complaint.

Witnesses on behalf of appellant testified among other things as follows :    Locomotive engineer :—" That the practice was to sound the whistle when the flag was out for danger ; that they always answered with a whistle when the flag was out for danger, and slowed down ; that he saw no such signal that day ; that, had there been signals out at the quarry, would have slowed up."    And on re-direct examination :    " If there was no danger at the quarry, signals would not be put out."

And the Fireman, on direct examination :    "If there had been a signal flag placed out at the quarry, we would have whistled when approaching the quarry ; if a flag

had been out, it would have been on the right hand side of the track, to attract our attention, a green flag to slow up and a red flag to stop; if we had seen one, we would have whistled." On cross-examination: "I saw no signal when we came by the quarry. Signals are not allowed, unless obstructions are on the track. Signals should be placed out *if anything is on the track.* It would be the duty of the man obstructing the track, or finding it obstructed, to put out signals. *It would be the duty of the man who had charge of the quarry to regulate the signals.* The signal would be placed fifteen telegraph poles from the point of danger. The telegraph poles are about 175 feet apart. Caution signals are only given to slow up the train." And on re-direct examination: "It simply slowed down when signal was given. To slow down is to slack the speed so that the train is under the control of the engineer, in case there was rock on the track. It was not required to whistle at the quarry."

The evident purpose of this testimony was to exculpate appellant from the charge of negligently killing young Golden, an employee at the rock quarry, who, under the direction of the foreman of said quarry hands, was at the time on a hand-car a half mile away from the quarry, but proceeding to Ravenden on business pertaining to the quarry. This was the subject-matter of the inquiry. It was the province of appellant to introduce this proof, and it did so without objection on part of appellee. But it was not its province to limit the application of the rules it discloses to the quarry spot, and say, *Thus far they applied,* but not *to a half-mile, or any other distance, beyond;* nor is it its province to say that a hand-car was not contemplated as *an obstruction,* within the purview of these rules. These were questions for the jury, under the instructions of the court. The apppellant should be held to

respond to every phase of the issue which this proof in connection with all the other proof in the case raises, namely:

1.   If the jury concluded that such. rules as were thus shown applied to *hand-cars*, as obstructions, and were intended to protect *all the quarry men*, including those working immediately at the quarry, as well as those passing to and from Ravenden, and on the track in the vicinity of the quarry, and engaged in work pertaining to the quarry, then they were justified in saying that the foreman was negligent in not seeing that proper signals were placed on this occasion, warning passing trains of the danger ahead.

2.   Should the jury conclude that these rules were not intended to apply to hand-cars, and the men required to be on them, going to and from Ravenden to make the necessary reports of the work at the quarry, then it would appear that the company had no rules for their protection, and the question would recur as to the negligence of the company in failing to make some reasonable rules for their safety.

To my mind there is no avoiding the responsibility for the negligent death of Golden, it matters not which *"horn of the dilemma"* the appellant takes.   If the rules as proven applied to *hand-cars*, and were intended to afford protection to the men who were required to propel them, then the foreman, whose duty it was to " look after the signals," should have seen that caution or danger signals were properly placed ; and in failing to take this precaution he was guilty of negligence, for which the company was liable.   In coming to this conclusion, I assume, of course, that there was proof to show that he was the company's vice-principal, and I think there was ample proof to justify the jury in so finding.   He was in charge of thirteen or fourteen men, having entire control over them, hiring and discharging

at his pleasure; they were engaged in a dangerous work, getting out riprap, loading same, switching cars, etc. for that purpose, and constantly required to be on and about the company's track where five or six trains were passing daily. That the duties incumbent upon him to put out signals of danger, etc., providing for the safety of the men at work, were master's duties, there can be no question. If the rules, as proven, did not apply for the protection of the men on the hand-car, then the awful sequence of that ride to Ravenden on that day demonstrated the necessity for some such reasonable regulations.

A quarry two and a half miles from telegraphic communication, thirteen or fourteen men at work, any of them subject to be called at any time to propel a hand-car to Ravenden, on a track containing curves and where trains were liable to come along at any time at the rate of twenty-five or thirty miles per hour, demanded, it seems to me, some rules for their protection.

The precautionary steps taken by the foreman on this occasion were entirely insufficient to meet the necessities of the case; and if he be left without any definite rules, to improvise such measures as each exigency may call for, the company should be held liable where he negligently fails to do his duty. It would seem, from the evidence, that Golden had a right to suppose, when he consented to go upon this perilous journey, that trains would whistle when they passed the quarry, and he would thus be notified of their approach; for one witness testified that the foreman said that was a rule of the company; and another, that trains generally whistled when they passed the quarry.

The foreman put this young man, of three days experience, on the front of the car, standing with his back to the direction in which it was going, and told him "*to look out*," that the train was liable to come along at

any time, and put him where he could see it; yet it appears from the evidence that a train came dashing around a curve at the rate of twenty-five or thirty miles an hour, and was within 500 feet of them before any of them saw it. And so great was the consternation, even of the foreman, with all his experience, at the sudden and unexpected appearance of the fast moving freight, he exclaimed, "My God, boys! There's the train. Throw on the brakes!" One of the witnesses testified that appellee either fell off on his back, or jumped off backwards and fell on his back on the track. The jury were justified in concluding that this sudden stopping of the hand-car threw the young man backwards on the track, which was a reasonable and natural explanation of the inextricable attitude in which he was placed. So that the simple caution to "look out" was not sufficient; and the failure to take some other step, which he should have done under the rules provided, according to the proof ; or else the failure of the company to make reasonable provision for the safety of these men, was negligence which contributed directly to the death of appellee. The verdict of the jury in my judgment was right, and the complaint should be treated as amended to conform to the proof. In the case of *Triplett* v. *Railway Co.* 54 Ark. 289, the complaint was as follows: " That the defendant so carelessly and negligently managed and operated its train and cars that they passed over the body of the deceased, and thereby without the fault of the deceased he was killed." A comparison of this with the complaint as copied above in this case will show that they are very similar in phraseology, and in legal purport the same.

In the Triplett case, Mr. Justice Fletcher, speaking for the court on a motion for rehearing, said : "At the trial, evidence was introduced without objection to show, on behalf of the plaintiff, that the railway company had

failed to afford a proper and safe place for the deceased to work, and had not exercised proper care in affording him protection. * * The company introduced evidence upon the same issue. In fact, the burden of the evidence in the case was upon this issue. * * * The facts thus developed were undisputed, and the court gave instructions on both sides as to the law bearing upon the same." And, citing the case of *St. L., I. M. & S. R. Co.* v. *Harper*, 44 Ark. 527, concluded the opinion in the language of the court in that case: "After verdict for the plaintiff the complaint may be considered as amended to conform to this proof." I think the facts of this record call for the application of the same rule of law. *Hanks* v. *Harris*, 29 Ark. 323; *Healy* v. *Conner*, 40 Ark. 352.

It is obvious that the court has considered the instructions of the trial judge in the light of the complaint before verdict, and finding such of them as it has passed upon erroneous remands the cause with leave to amend the complaint.

I think, viewing the whole charge with reference to the complaint as already amended as above suggested, which the verdict upon the issues raised has already accomplished, there is no reversible error.