Nolan, Admx., v. N. Y., N. H. & H. R. Co.

MARY J. NOLAN, ADMINISTRATRIX, vs. THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

Third Judicial District, Bridgeport, Oct. Term, 1897. ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

| 70 | 159 |
| 70 | 442 |
| 70 | 159 |
| 71 | 608 |
| 71 | 682 |
| 70 | 159 |
| 72 | 43 |
| 72 | 81 |
| 72 | 195 |
| 72 | 250 |
| 72 | 366 |
| f72 | 407 |
| 72 | 584 |
| 72 | 686 |
| 70 | 159 |
| 73 | 254 |
| 73 | 686 |
| 70 | 159 |
| 74 | 345 |
| 74 | 550 |
| 70 | 159 |
| 75 | 142 |
| 75 | 143 |
| 75 | 712 |
| 70 | 159 |
| 77 | 103 |
| 77 | 354 |
| 77 | 355 |
| 77 | 357 |
| 77 | 370 |

Inferences or conclusions of the trial court which result from sifting and weighing evidence and the credibility of witnesses, are matters of fact which this court cannot review; but the inference or conclusion drawn by the trial court from these specific, adjudicated facts, of legal liability, and of subordinate conditions essential to legal liability, are matters of law reviewable by this court upon appeal, where all the adjudicated facts appear of record.

The plaintiff's intestate was killed in a rear-end collision upon the defendant's railway, which was alleged to have been caused by its negligence in failing to give telegraphic information to each of the colliding trains, of the position of the other, and in failing to exercise proper supervision of the movement of said trains. From the special facts found, the trial court inferred that the rules and regulations of the defendant did not sufficiently provide for the emergency, and for the reasonably safe operation of the colliding trains, and held the defendant guilty of negligence in this respect. These rules and regulations formed a part of the record, and the trial court found that for the general movement and operation of trains they were the best and safest general rules yet devised by the best railroad talent in the country. *Held :—*

1. That the inference of the trial court as to the existence of an emergency and the adequacy of the rules, was, in view of all the facts stated in the record, a conclusion in respect to a matter of law, and therefore reviewable by this court.

2. That the giving of telegraphic information to the colliding trains was not, upon the facts specially found, a duty imposed upon the defendant by law; and consequently its failure to give such information violated no legal right of the intestate.

3. That the conditions attending the colliding trains did not differ essentially from those generally attending trains moving in the same direction, and did not create an exceptional situation or emergency unprovided for by the rules.

In some instances it is impracticable for the trial court to set forth its inferences from testimony in a clear, detailed statement of adjudicated facts; and in such cases, although the inference of liability drawn by the trial court is one of law, yet it cannot be reviewed by this court, because the fact or facts upon which it rested cannot be transferred from the mind of the trier to the mind of the appellate

court; and the inference is therefore, practically, a conclusion of fact.

A railroad company is bound to enforce as well as to adopt adequate rules for the movement of its trains.

The rule exempting the master from liability for an injury to one of his servants caused by the negligence of another, is too firmly established to be reversed or seriously modified by the judicial power.

The case of *Sprague, Admx., v. New York & New England Railroad Co.*, 68 Conn. 345, explained and distinguished.

[Argued October 29th, 1897—decided January 5th, 1898.]

ACTION to recover damages for personal injuries resulting in the death of the plaintiff's intestate, brought to the Superior Court in Fairfield County and heard in damages to the court, *George W. Wheeler, J.;* facts found and judgment rendered for the plaintiff for $5,000 damages, and appeal by the defendant for alleged errors in the rulings of the court. *Error.*

The facts on which liability is claimed, are alleged in the third and fourth paragraphs of the complaint. The third paragraph avers that on March 12th, 1896, the defendant ran a freight train south on its road and followed that train with a snow plow and engine, and while so operating said trains was negligent "in failing to give proper telegraphic information to the conductor and engineer of each of such trains, relative to the position of the other of said trains; by failing to give proper orders to the conductor and engineer of each of said trains; by running the said rear or snow-plow train at a high and dangerous rate of speed; by failing, when the said freight train, as hereinafter stated, was left standing upon the main track, to give sufficient and timely signal and warning to the approaching aforesaid snow-plow train; by failing to have upon the said freight train a sufficient number of men to do the freighting work required of the train crew, and also to guard against collision; by failing to have sufficient and serviceable brakes upon the snow plow and locomotive composing the snow-plow train; by using and putting into said snow-plow train a plow so huge and improperly constructed that it obstructed the engineer's view of the tracks in dangerous places on said railroad, and while approaching the place where the collision, hereinafter

stated, occurred; by having in the said snow-plow only such windows as were too small and inconveniently placed to serve properly for lookout purposes; by failing to have a proper, certain and speedy means of signalling from the snow-plow to the engineer of the locomotive; by failing to exercise proper supervision of the running of said trains; so that the said snow-plow train collided with the said freight train at a place on said railroad in the town of Kent, near the Kent Furnace switch, and as a result of such collision the plaintiff's intestate, Jerry Nolan, received severe injuries, which injuries were aggravated by exposure and rough treatment, made necessary by the negligence of the defendant in failing to have upon the said snow-plow train a hospital stretcher, as the law required. In consequence of the aforesaid injuries the said Jerry Nolan died. *Fourth.* At the time of the said collision the said freight train, with the exception of the locomotive, was standing upon the main track near the Kent Furnace switch, in the town of Kent, the same track upon which the snow-plow train was approaching. The locomotive of the freight train had been detached and was working on a side track. The said snow-plow train, coming at a terrific rate of speed, crashed into the rear end of the freight train. The said Jerry Nolan was rightfully within said snow-plow, which, by the force of the collision, was crushed in upon him, inflicting severe injuries."

The finding states the facts on which the judgment is founded, as follows: " 1. On March 12th, 1896, the defendant was a duly organized corporation under the laws of the State of Connecticut, and was operating its single track road with sidings and switches, extending from the city of Bridgeport in the State of Connecticut, to the city of Pittsfield in the State of Massachusetts, and forming a part of what is known as the Berkshire Division of the defendant. 2. At all of the regular stopping places for trains, with three exceptions, the defendant maintains a telegraph office, and the departure of all trains from stations having a telegraph office is at once telegraphed to New Haven to the

train-despatcher. 3. At all of the regular stopping places for trains, with three exceptions, the defendant maintains a time board upon which the station agent places in large figures the time of departure of each train from these stations. The time board apprises the conductor and engineer of each train of the time of departure of the train last at the station and going in the same direction, and these officials rely upon such information in regard to the position of trains in advance, in the absence of special order. 4. The movement of all trains upon this division was in the exclusive control of the train-despatcher at New Haven. Conductors and engineers and all officials were bound to obey his orders. He acted in the name, by the authority, and in the place of the defendant. 5. The division superintendent ordered trains to run, and the train-despatcher gave the running orders by telegraph. 6. The train-despatcher had at all times the location of every train, regular and extra, running upon this division, as they passed the telegraphic stations, and knew at what stations or places each train was to stop, and about the length of time it would be required to stop. 7. Whenever special orders to control the movements of trains are necessary, the train-despatcher at New Haven sends such orders by telegraph to the operator located at a station which such train is approaching, and the operator hands a copy of said order to the conductor and a copy to the engineer of said train. 8. On said day the regular way freight, known as 1411 and so designated hereafter in this finding, started from Great Barrington at 5:30 A. M. It gradually fell behind its schedule time and at Falls Village was considerably late. Freight trains are often late, and every one connected with the operation and movement of defendant's trains knew this. 9. At Great Barrington the conductors received an order from the division superintendent to stop at Kent Furnace and attach to 1411 three freight cars on a siding there. 10. Kent Furnace is between North Kent and Kent, and is nothing but a railroad siding where freight trains occasionally stop, but only upon orders from the division superintendent. There is no station, no station

agent, no telegraph or time board there.    There are only two other places on this division where freight trains stop, similar to this place, *viz.:* Trumbull Ice Pond and South Glendale. Kent Furnace is an unusual stopping place, not named upon the official time-table in use by defendant's employees. 11. Freight 1411 ran at the rate of from 20 to 25 miles an hour, the usual speed of freight trains, and when it left Cornwall Bridge at 10:28 A. M., its last stopping place, and the last station at which telegraphic orders could have been issued to it, it was 1 hour and 18 minutes behind its regular schedule time.   12. The only station between Cornwall Bridge and Kent is North Kent, where they have no telegraph, and where 1411 was not required to stop and did not stop on this day.    13. Kent Furnace is about 7 miles, and Kent about 8½ miles, from Cornwall Bridge.    14. Freight 1411 reached Kent Furnace about 10:50 A. M., and while the train remained on the main track the engine began the work of getting the three freight cars from the siding to the main track.    15. The usual running time for the freight train between Cornwall Bridge and Kent Furnace, where no stop is made at North Kent, is 21 minutes; and the usual stopping time to do the work at Kent Furnace is 15 minutes. 16. The work at Kent Furnace on this morning would have taken the usual stopping time, 15 minutes.   17. Between 5:30 and 6 A. M. an extra train known as 474 and hereafter in this finding so designated, consisting of a snow plow, locomotive and tender, the snow plow being ahead of the locomotive and tender and pushed by the locomotive, left Pittsfield for the purpose of clearing the track of defendant of snow.  .18. Train 474 ran at about 40 miles an hour and steadily gained on 1411.   In order that 474 should do effective work it was necessary that it run between 35 and 40 miles an hour.    19. Train 474 received telegraphic orders at Falls Village to run extra to New Milford.   New Milford is the fourth station below Kent.   This gave 474 the right of the track to New Milford, keeping ten minutes off the time of all regular trains.   Thereafter train 474 ran under this order, which was in accordance with the rules.

When 474 reached a station and the time board showed that the last train at the station had departed ten minutes or more before, 474 might continue its run, in the absence of special order. 20. Train 474 passed Cornwall Bridge at 10:52 A. M., 24 minutes behind freight 1411, under the order recited in paragraph 19, *supra*. 21. Train 474 knew freight 1411 had passed Cornwall Bridge at 10:28. 22. Train 474, under the rules of defendant, had the right to proceed, and under the order recited in paragraph 19 was bound to proceed, and did so, running at the rate of 42 miles an hour. 23. Train 474, and no one on board of her, knew that 1411 had received orders to stop at Kent Furnace; the conductor in charge and the engineer knew from the order that 474 had the right of track to New Milford. 24. No one in charge of or on 1411 knew officially that 474 was in the rear; the conductor and rear brakeman had heard the night before that 474 would be out in the morning, but had no information that 474 was in fact out. No one on 1411 knew the location of 474 at any time on said day. The conductor of 1411 had cautioned rear brakeman, Hall, at West Cornwall, the station just north of Cornwall Bridge, to look out for 474, but gave him no further caution or order. 25. No order was received by those in charge of 474 or 1411, of the location of either of said trains or of any fact relating to either train. 26. The train-despatcher knew that 474 must overtake 1411 either at Kent Furnace or on the track before reaching Kent, and all of the foregoing facts except those in paragraphs 1, 14, 16 and 24, and in the last two lines of paragraph 18, were known, or ought to have been known, to him, as well as those contained in paragraphs 49 to 53 inclusive. 27. The snow plow on 474 was in charge of plaintiff's intestate, the assistant roadmaster of defendant, who was engaged in working the flanges, the appliances used in cleaning the tracks; lifting them when they came to bridges, switches, etc., and lowering them thereafter. 28. Within the front part of said snow plow was a small elevation above its main floor, known as the observatory or cupola, and from which, through two circular windows about

fifteen inches in diameter, the track could be seen. The snow plow was so constructed that it prevented a view ahead of the engine by the engineer. 29. Rule 104 of said defendant, for the movement and operation of trains, provides that, 'when a train is being pushed by an engine, a flagman must be stationed in a conspicuous position on the front of the leading car, so as to perceive the first sign of danger and immediately signal the engineman.' 30. The cupola was designed to carry two men, one to work the flanges, and one to act as a lookout. 31. Between West Cornwall and Kent Furnace no one was in the cupola as a lookout or flagman; the assistant superintendent of the division was in said cupola watching the working of the plow, for which purpose he boarded the plow at Falls Village. 32. In the small compartment on the main floor of the plow was a stove, and nine men who were laborers, to shovel snow in case of a drift, and other employees of defendant. 33. Said day was very cold and the snow plow threw the snow considerably, rendering it difficult to see ahead; just before the accident the plow was not throwing much snow, and a lookout could see through said two windows. 34. During the trip from Pittsfield an employee, by direction of the conductor, had cleaned the two windows in the cupola every time 474 stopped; it was impossible to clean them while the train was in motion, and these windows had not been cleaned since 474 stopped at West Cornwall, 18 minutes before. 35. After 1411 stopped at Kent Furnace the rear brakeman, Hall, went up the track to flag 474. Rule 97 covered all the duty devolving on Hall, and provides : ' When a schedule freight train is detained at any of its usual stops beyond its leaving time, when the rear of the train can be plainly seen from a train moving in the same direction at a distance of at least *twenty telegraph poles*, the flagman must go back with danger signals not less than fifteen · telegraph poles, and as much farther as may be necessary to protect his train ; but if the rear of his train cannot be plainly seen at a distance of at least *twenty telegraph poles*, or if it stops at any point that is not its usual stopping place, *or if an extra* train

is stopped at any point, the flagman must go back not less than *twenty telegraph poles*, and if his train should be detained until within *ten* minutes of the time of a passenger train moving in the same direction, he must be governed by Rule No. 99.' The employees of defendant occasionally violated this rule, and the conductor in charge of 1411 knew this. Trains sometimes stopped so short a time that a strict compliance with the rule was impossible, unless the brakeman was left behind, which sometimes occurred. No. 474 was an extra train, and Hall's duty under the rules was to go back twenty telegraph poles and flag the same; this was a distance of 3,000 feet, the telegraph poles being 150 feet apart. Hall went up the track about 600 feet, when train 474 rounded a sharp curve. 36. The assistant superintendent saw Hall running up the track and flagging, as soon as he could have been seen from 474, and when 474 was about 600 feet from Hall, he jumped from the cupola to the compartment and motioned the conductor to stop the train; the conductor at once jumped upon the cupola and pulled the bell rope twice, but it did not ring the bell in the engine cab; this bell rope connected with the engine, and the engineer relied upon it to warn him of danger ahead. 37. The engineer saw around the sharp curve, from the right hand side of his cab, flagman Hall, when about 300 feet ahead, and he at once did all that he could do to stop 474 by reversing and applying brakes to engine and tender. 38. There was no air brake on said plow, the only brake being a hand brake. 39. Train 474 slowed down in running the 900 feet to train 1411, after flagman Hall was seen; it was running about 20 miles an hour when it struck the rear of the freight train as it stood on the main track; it plunged through three freight cars before it stopped. The collision occurred at 11:02 A. M., ten minutes after 474 passed Cornwall Bridge. 40. As a result of the collision the conductor of 474 was killed, some of the men in the compartment were injured, and the plaintiff's intestate was fatally injured. He lived about two or three hours after the collision, suffering greatly and then died. He was 51 years of age, in good

health, and was at the time of his death and for some time before had been, the assistant roadmaster of the Berkshire Division of the defendant, having been employed on this division some 30 years. 41. Had the engineer been notified through the bell, of the flagman ahead, and had he then done all he could to have stopped the train, the collision could not have been avoided, but probably its force and extent might have been somewhat modified. 42. There was no negligence on the part of any of the employees of train 474, or of train 1411, except rear brakeman Hall. 43. Said train 474 was properly equipped and its appliances in good order, except that it had no hospital stretcher on board as required by statute, and no air brakes on the snow plow; its appliances were in good order except the said bell cord and bell. Train 1411 and its appliances were proper and in good order. 44. The absence of the hospital stretcher in some degree increased the sufferings of the plaintiff's intestate, who had to be removed on boards for some distance, but did not cause his death. 45. Train 474 could have been stopped in about 1,500 feet, or the distance of ten telegraph poles. 46. Had the rear brakeman gone back twenty telegraph poles and signalled, and had those in the cupola or on the engine of 474 seen him and done their duty, the collision would not have occurred. 46½. The rear brakeman had about time to have gone back 3,000 feet after 1411 stopped at Kent Furnace, but not time enough to have returned to 1411, nor to have returned within the ordinary time of stopping at Kent Furnace. 47. The rules or regulations for the movement and operation of trains, adopted and used by the defendant, were substantially the same as those adopted by the American Railway Association, after protracted conferences, and revised from time to time at the semi-annual meetings of this association. About ninety per cent. of the steam railways of this country are using these rules, with such modifications as adapt them to the particular railway. 48. For the general movement and operation of trains these rules are the best and safest general rules yet devised by the best railroad talent of the country. 49. The only protection

afforded by these rules to trains 474 and 1411, to prevent
their colliding, was the rule quoted in paragraph 35, *supra.*
These rules did not, and are not intended to, cover all emer-
gencies; these call often for special orders. 50. No order
had been sent 474 or 1411 when they should meet, and it
was certain they would meet unless 474 was stopped before
1411 reached Kent. It was a part of the train-despatcher's
duty to notify trains, not regulated by the time tables and
rules, in advance, where they would meet, so that they might
know this fact and collisions be avoided. Ordinary care re-
quired such orders, and in his failure to notify trains 474 and
1411 of this, he was negligent. 51. Train 474 was a special
and irregular train, run for an unusual purpose, for the first
time the morning in question. The circumstances of this
case were unusual, and presented an emergency which prob-
ably no general code of rules could provide for, and the rules
in question did not provide for; it required special orders
and special instructions to trains 474 and 1411, so that train
474 should not collide with 1411 between Cornwall Bridge
and Kent. 52. Extra trains are run daily over said division,
averaging from 8 to 15, and some days as high as 20. 53. It
would be impracticable to operate extra and regular trains
entirely by special orders. In cases of emergency this must
be done, and general rules cannot cover them. The meeting
places of trains not upon the time-table, and of regular trains
off the regular time, is provided for by special orders, and
not governed by the printed rules. 54. Those in charge of
474 and 1411, and rear brakeman Hall, were familiar with
the rules and knew that in ordinary cases the rules and not
special orders would govern the movement of all trains on
the division. The defendant had exercised ordinary care in
the selection of all its employees on trains 474 and 1411.
55. On March 20th, 1896, the plaintiff was duly appointed
administratrix of the estate of said Jerry Nolan, and duly
qualified. 56. Written notice of a claim for damages was
made in conformity to the statutory provision. 57. Time-
table No. 23 and the rules (Ex. B.) are made a part of the
record, but need not be printed; copies of the same may be

handed to the judges of the Supreme Court of Errors. 58. I find, as a fact, that these rules did not sufficiently provide for this emergency, and for the reasonably safe operation of trains 474 and 1411. This emergency required the exercise of great care by the defendant, since the danger of collision was great. 59. I find, as a fact, that the defendant was negligent in not providing for this emergency, and for the safe operation of trains 474 and 1411, by special orders and instructions, in addition to the general rules, and that this collision resulted from the defendant's failure to so provide. 60. I find, as a fact, that the operation of these trains under these general rules alone, under the circumstances of this case, was not a suitable and safe method to operate these trains. 61. I find, as a fact, that the train-despatcher did not exercise ordinary care in not issuing special orders for the reasonably safe movement of these trains. 62. I find, as a fact, that the injury to plaintiff's intestate resulted from the combined negligence of rear brakeman Hall and of the defendant. 63. I find, as a fact, that the defendant did not exercise ordinary care in the movement and operation of trains 474 and 1411. 64. I find, as a fact, that the plaintiff's intestate was not guilty of any negligence contributing to his injury or death."

The finding also states the defendant's claims of law, as follows: "1. That if the collision occurred through the negligence of rear brakeman Hall, the plaintiff was entitled to nominal damages only, because Nolan, the plaintiff's intestate, and said rear brakeman were fellow-servants. 2. That upon the facts in evidence, the defendant having operated its trains under suitable rules and regulations, and having properly equipped such trains, had performed its entire duty towards plaintiff's intestate, and the law imposed no higher degree of care than that exercised by it. The court sustained the defendant's first claim, but did not pass upon its second claim, except to find, as a matter of fact from the evidence submitted, that the defendant did not exercise ordinary care in the operation of these trains, and that ordinary care required additional precautions by way of special orders,

to those provided in the rules for the reasonably safe operation of these trains."

The defendant assigns as reasons of appeal, error in the ruling on its second claim of law; also error in inferring from the facts found, the conclusions stated in paragraphs 58 and 63 of the finding, and error in certain of the conclusions of fact from the testimony given on the trial, a copy of which testimony is certified and made a part of the appeal record.

*Goodwin Stoddard* and *William D. Bishop, Jr.*, for the appellant (defendant).

None of the material facts in this case, either on the trial or in making up the record, were disputed. The manner in which the collision occurred, the relative positions of the two trains prior to the collision, the official information which each train had of the location of the other, the existence of printed rules and the familiarity of the employees with them and their duties under them, the failure of the rear brakeman to observe the rules, the knowledge of the train-despatcher of the situation of the two trains, and his conduct in view of the situation, and, in general, all of the facts and circumstances surrounding the collision, were absolutely undisputed. It remained only for the trial court to determine whether the conduct of the defendant, under the conceded circumstances, was what we should expect of a man of ordinary care under such circumstances. To reach a conclusion in the matter required a consideration and determination of it as a question of law. *Sharp* v. *Lockwood*, 12 Conn. 159; *Belden* v. *Lamb*, 17 id. 451; *Schoonmaker* v. *Machine Co.*, 51 id. 392; *Nolan* v. *R. R.*, 53 id. 471; *U. P. R. Co.*, v. *McDonald*, 152 U. S. 282; *Morrissey* v. *Bridgeport Traction Co.*, 68 Conn. 215. The question is, was it the duty of the defendant to perform the acts required of it by the trial court? This has always been held to be a question of law, and the fact that the trial court has in so many words determined it as one of fact, is not effective to make it such. *Nolan* v. *R. R.*, 53 Conn. 471; *Sprague* v. *R. R.*, 68 id. 345;

*Morrissey* v. *Bridgeport Traction Co.*, *supra.* In cases similar to the present one the reasonableness of rules and regulations has been held to be a question of law, and not of fact. *South Florida R. Co.* v. *Rhodes*, 25 Fla. 45; *Wolsey* v. *R. R.*, 33 Ohio St. 234; *Vedder* v. *Fellows*, 20 N. Y. 130; *Memphis, etc., R. Co.* v. *Graham*, 94 Ala. 556; *Ill. Cent. R. Co.* v. *Whittemore*, 43 Ill. 423; *Louisville R. Co.* v. *Fleming*, 14 Lea (Tenn.), 145; *N. & W. R. Co.* v. *Wysor*, 82 Va. 261; *Chilton* v. *R. Co.*, 114 Mo. 91; *Avery* v. *R. Co.*, 121 N. Y. 44; *St. L. R. Co.* v. *Adcock*, 52 Ark. 410; *Kansas City R. Co.* v. *Hammond*, 58 Ark. 334; *Hoffbauer* v. *R. Co.*, 52 Iowa, 343; *Enright* v. *R. Co.*, 93 Mich. 409; *Abel* v. *R. R.*, 103 N. Y. 587; *Pittsburg R. Co.* v. *Lyon*, Pa. Superior Ct. Jan. 1889. The *proximate cause* of this unfortunate accident was the failure of the rear brakeman to observe the rules, and the fact that now, with this experience before us, we are enabled to suggest innumerable precautions which, if adopted by the defendant, *might* have averted this collision, furnishes no just ground for holding that the exercise of reasonable care required their adoption. *Hayes* v. *R. Co.*, 57 Mass. 274; *Enright* v. *R. Co.*, 93 Mich. 409; *Ill. R. Co.* v. *Neer*, 31 Ill. App. 126; *R. Co.* v. *Lang*, 118 Ind. 579. It should not be forgotten that both of these trains were operated strictly in accordance with the rules; that a notice to them from a train-despatcher, of the character deemed necessary by the trial court, would have been an unusual and dangerous departure from the rules; and that an observance of said rules by the rear brakeman would have averted the collision.

*John Cullinan, Jr.*, and *Thomas M. Cullinan*, for the appellee (plaintiff).

The negligence of the defendant was a question of fact for the conclusive determination of the trial court. This very question, whether under certain circumstances special instructions and orders, in addition to the general rules, are required, was adjudged to be a question of fact in *Sprague* v. *New York & N. E. R. Co.*, 68 Conn. 347. See also *Fritts* v. *N. Y. & N. E. R. Co.*, 62 Conn. 503, 508; *Donovan* v. *Hart-*

*ford St. R. Co.*, 65 id. 201–214; *Dundon* v. *N. Y., N. H. &
H. R. Co.*, 67 id. 266, 269; *McAdam* v. *Central Ry. & Electric
Co.*, ibid. 445; *Heenan* v. *Bridgeport Traction Co.*, ibid. 594.
The question of negligence in this case was a complex one
to be determined from a great number of facts and condi-
tions produced in evidence.   It is apparent that the law can-
not supply a legal deduction which may be applied to any
array of facts, which would be necessary if its determination
of the question of negligence in this and similar cases were
a question of law.   The case did not turn upon the standard
of duty to be applied, but upon the conduct of the defend-
ant; and the learned court, knowing the degree of prudence
required by law, concluded from the evidence that the con-
duct of the defendant was not what the conduct of a prudent
man would have been under like circumstances.   *Peltier* v.
*Bradley, D. & C. Co.*, 67 Conn. 49; *McAdam* v. *Central Rail-
way & Electric Co.*, ibid. 447.   If train 474 had not collided
with train 1411 at Kent Furnace, and if train 1411 had done
its work there and started on toward Kent—there being no
time board at Kent Furnace to inform train 474 when 1411
departed—then, according to the finding of the court, which
the defendant does not dispute, train 1411 must inevitably
have been overtaken by train 474 before reaching Kent, and
while both trains were in motion, when no duty devolved
on brakeman Hall.   Certainly the negligence of the company
could not be questioned then.   That the trains met before
this, when a duty of brakeman Hall was neglected, does not
relieve the company of negligence.   The relation of the de-
fendant company to the supposed situation and to the actual
situation, is the same.   Both trains were moving on the
same orders and instructions in the actual situation, as they
would have been in the supposed.   The negligence of the
railroad company was present at least from the time that the
trains, especially 474, were allowed to pass Cornwall Bridge,
the last place that they could have been reached by tele-
graph, without additional orders and instructions.   If the
negligence of the company contributed it must necessarily
have been an immediate cause of the accident, and it is no

defense that another was likewise guilty of wrong. *Grand Trunk Railway Co.* v. *Cummings*, 106 U. S. 702; *Wilson* v. *Willimantic Linen Co.*, 50 Conn. 433; *Sprague* v. *N. Y. & N. E. R. Co.*, *supra*; *Elmer* v. *Locke*, 135 Mass. 576; *Cowen* v. *Del., Lack. & West. R. R.*, 81 N. Y. 206; *Crowell* v. *Thomas*, 90 Hun, 198; *Paulinier* v. *Erie R. Co.*, 34 N. J. L. 155; *Rogers et al.* v. *Leyden*, 127 Ind. 50; *Young* v. *S. H. & H. Iron Co.*, 103 Mo. 324; *Sherman* v. *Menominie River L. Co.*, 72 Wis. 127.

HAMERSLEY, J. The finding of facts upon which judgment is founded, contains a statement in detail of inferences produced, in whole or in part, by weighing evidence and the credit to be given witnesses, and also of the conclusions drawn from these inferences. The former are called facts, as denoting adjudicated facts which can only be retried by an appellate court having jurisdiction in the trials of such facts. This court does not have appellate jurisdiction of that nature; the Superior Court is the court of last resort for that purpose, and its adjudication of such facts, in the exercise of original or appellate jurisdiction, is the end of litigation; unless in the process of adjudication it has violated some rule or principle of law. *Styles* v. *Tyler*, 64 Conn. 324; *Thresher* v. *Dyer*, 69 id. 404, 408. The alleged failure to determine such facts correctly, is improperly assigned in the appeal as error, and cannot be considered. The request of counsel, for the certification of testimony in support of such claimed errors, is an abuse of the provisions in respect to certifying evidence. *Thresher* v. *Dyer*, *supra*.

The latter, that is, conclusions drawn from such facts, are also called facts, but with a much broader signification, including all issues that the line separating the province of the jury from that of the judge in a jury trial practically leaves to the jury. The word fact, used in this broad sense, does not accurately denote matters not reviewable by this court. In defining facts as denoting those questions practically within the province of a jury, we are controlled not only by established practice, but by the constitutional pro-

vision forbidding any violation of the political "right of trial by jury." In defining facts as denoting questions not reviewable by this court, we are controlled by "the primary distinction drawn by the Constitution, between the jurisdiction original and appellate of courts for the full trial and adjudication of causes, and the jurisdiction of a court of last resort for correcting errors in law which may have intervened in the course of a trial." *Atwater* v. *Morning News Co.*, 67 Conn. 504, 526. "The true distinction as drawn under our system of jurisprudence, in connection with this provision of the Constitution, between facts that the trial court must find from the testimony, and the application of principles of law based upon such facts," includes "questions of law" as distinguished from "questions of fact" in a jury trial, but is not fully expressed by that distinction. While the jurisdiction of this court may be affected in its practical operation by existing procedure or practice, the jurisdiction itself, "is coextensive with the judicial power of the State in all matters wherein legal principles, that is, rules of law or principles of equity, appear to have been erroneously or mistakenly determined by a trial court." *Styles* v. *Tyler, supra,* 454. The limitations of procedure formerly existing, in connection with the practice followed in view of that procedure, prevented in some instances the full exercise of our jurisdiction; and the conclusions of trial courts,—because not presented in such manner as to be reviewable under existing procedure and practice,—have been spoken of in language appropriate enough for that purpose, as questions of fact. But whenever the record before us has legally presented all the facts found by the trial court as the basis of its judgment, and the conclusion drawn from those facts has been plainly erroneous, and such error has been lawfully assigned, we have uniformly held such conclusion, although for some purposes it might be called a question of fact, to be, *quo ad* the jurisdiction of this court, a question of law; *i. e.*, it is reviewable.

When the finding of facts states evidence, so that the conclusion must be reached by weighing evidence, the find-

ing is essentially a report of evidence and not a statement
of facts adjudicated, and the question of legal inference
from facts that may be involved, is irregularly presented.
*Corbin* v. *American Mills*, 27 Conn. 274, 278. In *Bloodgood*
v. *Beecher*, 35 Conn. 469, the judges were equally divided
upon the question whether, upon the finding of facts in that
case, the intention of a mortgagor to prefer the mortgagee to
his other creditors, could be drawn by this court as a conclu-
sion of law; HINMAN, C. J. and PARK, J., holding that it
could not, and BUTLER and CARPENTER, Js., holding that
it could. The case was decided by the second vote of the
Chief Justice. In *Mead* v. *Noyes*, 44 Conn. 487, the trial
court, in an action of replevin, spread upon the record the
facts from which it drew its conclusion that the plaintiff
was the owner of and entitled to immediate possession of
the property replevied; and, upon motion in error, this court
reversed the judgment because the conclusion from the facts
found was an error in law. In *Hayden* v. *Allyn*, 55 Conn.
280, 289, Judge LOOMIS, speaking for the court, laid down
the broad principle that whenever in trials to the court the
judge has fully weighed the testimony and passed upon the
credit of witnesses, and specifically found as the basis of his
judgment the inferences produced by the testimony, so that
the evidence "had exhausted itself in producing the facts
thus found, nothing remained but for the court in the exer-
cise of its legal judgment to draw its inferences from the
facts;" and "in such a case the conclusion of the court can
always be reviewed by the appellate court. An erroneous
conclusion is an error of law and not an error in an inference
of fact." This principle was deliberately affirmed in *Tyler*
v. *Waddingham*, 58 Conn. 375, 386, and applied to a special
finding of facts from which was drawn the conclusion that
the plaintiff, at the time of making a contract with a part-
nership, elected to give exclusive credit to a single partner.
In *Ward* v. *Ward*, 59 Conn. 188, 197, the principle is recog-
nized as established, although its application in that case is
treated with some subtilty. The principle may at times be
misapplied, but a mistake of this kind cannot shake its au-

thority. It is not only supported by the true *ratio decidendi* of a long line of decisions, but is embedded in the very structure of our system of jurisprudence. Settling the credit of witnesses; weighing evidence; ascertaining the truth from conflicting testimony or incongruous evidential facts;—this is the peculiar province of, and under our system within the exclusive jurisdiction of, trial courts, and a mistake in the inference produced by such means is an error in fact; when such facts are adjudicated, a mistake in drawing the legal inference, *i. e.*, in applying the law to the facts found, is an error in law.

The application of this principle has been hampered and its meaning somewhat obscured, through inadequate and uncertain methods for bringing into action the jurisdiction of this court. Sometimes the conclusion of a trial court from conceded facts is so clearly right that practically no question is presented, and in such cases we have said that the conclusion is one of fact properly decided; yet if in such cases the conclusion, instead of being clearly right, had been a palpable *non sequitur*, we would have reviewed it as a question of law, unless the question were irregularly presented. But more frequently the alleged error in a conclusion from conceded facts has been irregularly presented; either through mistake in making up the record, or through defect in methods for obtaining a record which should properly present the question; and in such cases we have said that the conclusion is one of fact not reviewable. Such indeterminate use of the phrase "question of fact," or "conclusion of fact," must be taken in connection with the circumstances of each case, and cannot be treated as precisely distinguishing those conclusions which are to be treated as facts in respect to the jurisdiction of this court, nor as modifying the settled principle that the unwarranted conclusion of a trial court in drawing its inference from the special facts which, in compliance with existing law of procedure it has found for the purpose of drawing that inference, is essentially an error in law.

For many years, and especially since 1879, the legislature

has endeavored by means of various statutes to modify the law of procedure, so as to require a trial court to place upon record the special facts on which its judgment is founded, and to enable this court to exercise its full jurisdiction in reviewing the legal judgment of a trial court in drawing its inference from conceded facts. Such legislation has considerably enlarged the facilities for exercising the jurisdiction of this court. The effect of this legislation has been the subject of frequent consideration, and the main general conclusions reached are summarized in *Thresher* v. *Dyer*, *supra*, and *Winsted Hosiery Co.* v. *New Britain Knitting Co.*, 69 Conn. 565, 575. In the latter case we say: "The judgment or ultimate conclusion of a court upon the special facts in issue, as ascertained from the evidence and settled by the trier, is a conclusion of law, and as such reviewable by this court; and this is true whether such facts are settled by a special verdict of a jury or by a special finding of a judge." And referring to the changes in procedure: "We think that the result of this legislation is, that in cases tried to the court the judge is now authorized, and upon request required, to find and state in a special finding the facts adjudicated by him in reaching his ultimate conclusion, including all specific facts which, when so adjudicated, must determine the ultimate conclusion and subordinate conclusions involved therein, by force of settled rules and principles of law. The judgment rendered on such an adjudication of facts is simply the voice of the law declaring the legal effect of the facts adjudicated."

These considerations must control the disposition of the claim made in the case before us, that the conclusions we are asked to review are conclusions of fact and not of law.

It appears that the defendant operated a single track railroad, that train 474 (an extra train) following train 1411 (a regular way freight) ran into the latter train, which had stopped to attach some freight cars standing on a siding, and in the collision one Jerry Nolan, the plaintiff's intestate, was killed. Every special fact from which the trial court inferred the liability of the defendant for the injury is found, includ

ing the rules and regulations adopted by the defendant for safely operating these trains. The finding shows the neglect of one Hall, the rear brakeman of train 1411, to obey the rules provided for the protection of his train under such circumstances, and that the collision might not have happened if the rules had been obeyed; but also shows that Nolan and Hall were fellow-workmen; and the trial court, therefore, holds that the defendant is not liable for this neglect. The question of liability is not otherwise affected by the relation of master and servant. The complaint does not allege that this relation existed between Nolan and the defendant, and claims nothing by reason of that relation; but charges the defendant with negligently conducting itself in the management of said trains; and the only allegations, so far as is material under the finding, of acts constituting such negligent conduct, are: "by failing to give proper telegraphic information to the conductor and engineer of each of such trains, relative to the position of the other of said trains," and "by failing to exercise proper supervision of the running of said trains," so that train 474 ran into train 1411 and, as a result of the collision, said Nolan, who was rightfully on the former train, was killed. The trial court draws from the special facts found, the following inferences: that the rules and regulations of the defendant "did not sufficiently provide for this emergency (i. e., the operation of the trains in the manner as found), and for the reasonably safe operation of trains 474 and 1411; . . . that the defendant was negligent in not providing for the emergency (i. e., the operation of the trains as found) and for the safe operation of trains 474 and 1411, by special orders and instructions, in addition to the general rules; . . . that the operation of these trains under these general rules alone, under the circumstances of this case (i. e., the special facts as found), was not a suitable and safe method to operate these trains; . . . that the train-despatcher did not exercise ordinary care in not issuing special orders for the reasonably safe movement of these trains; . . . that the injury to plaintiff's intestate resulted from the combined negligence of rear brakeman Hall and of the defend-

ant; that the defendant did not exercise ordinary care in the movement and operation of trains 474 and 1411."

These inferences are reviewable as conclusions of law. It is true that in stating the inferences, the trial judge says, "I find as a fact," etc., but this is immaterial. It is the duty of the trial judge to find, as facts within the peculiar province of a trial court, those inferences which are controlled by the weighing of evidence and the credit given to witnesses; it is also his duty to find his conclusions drawn from these inferences of fact, which in a certain sense are also findings of fact; but they are conclusions reviewable by this court, and the name given them does not alter their intrinsic character of conclusions reviewable for error in law.

We think the court below erred in reaching these conclusions. They are all drawn in support of the claim set up in the complaint, that the defendant violated the legal rights of the plaintiff's intestate, because it failed to exercise proper supervision of the running of said trains, and because it failed to give telegraphic information to the conductor of each train, relative to the position of the other. The supervision of the trains (unless as involved in the failure to give telegraphic information) is to be found in the rules for the movement of the trains. These rules are before us; they are substantially the same as those in use by about ninety per cent of the steam railways of this country, and the trial court finds that "for the general movement and operation of trains these rules are the best and safest general rules yet devised by the best railroad talent of the country." There is nothing in the record that calls for a review of this finding; for the purposes of this case we assume the conclusion to be correct. These rules cover the movement of regular and extra trains; they provide for special orders for starting extra trains; they require the train-despatcher to give telegraphic information of the meeting place of such trains, and of trains moving in the opposite direction, as well as of regular trains off the regular time; but they do not require him to inform by telegraph trains moving in the same direction, of their relative position, and for that purpose to keep in mind

the position of all such trains so as to decide as they approach each station whether there is a likelihood that a rear train may overtake and, if the rules are not obeyed, run into the forward train. On the contrary they are drawn upon the theory that such telegraphic supervision of trains moving in the same direction, in view of all the conditions involved in operating a single track road, tends rather to lessen than increase the safety secured by the rules adopted relative to the movement of such trains. The soundness of this theory has received judicial sanction. *Enright* v. *Railway Co.*, 93 Mich. 409, 413; *Illinois Central R. Co.* v. *Neer*, 31 Ill. App. 126, 134. In the latter case some self-evident reasons are given. We think in this respect the rules of the defendant do not violate its legal duty, and that their compliance or non-compliance with that duty, under a given state of facts,—notwithstanding many cases hold that such question must be submitted with instructions more or less precise, to a jury, by force of the law defining the province of a jury,—is essentially an inference of law; and when drawn by a trial court, is reviewable by this court. So far, therefore, as the proper supervision of trains 474 and 1411 depended on the adoption of adequate rules for the safe operation of these trains, the only legal inference from the facts found is that the defendant did not fail to exercise proper supervision of the running of these trains.

The failure to give trains 474 and 1411 telegraphic information of their relative positions, is found as a fact, and the conclusions of the trial court are simply an inference from this fact, in connection with other facts found, that the defendant by this means had violated the legal rights of the plaintiff's intestate. In other words, the inference is one of legal liability, and affirms that the law which defines the duties of railroad corporations and the rights of persons lawfully on their trains, imposed upon the defendant the duty of giving such telegraphic information, and gave to the plaintiff's intestate the correlative right to have such information given. The validity of this inference is really determined in the disposal of the claim that the rules of the

defendant did not fulfill its legal obligation in the supervision of these trains, under the circumstances of the case, *i. e.*, the facts as found. The rules do not require such information to be given; because giving such information in all instances involving like conditions, would tend to danger rather than to safety. A railroad corporation in operating its road as a *quasi* public highway, is engaged in a business dangerous to human life, and is exercising for its private benefit a franchise granted by the State on condition that it transport such members of the public as have lawful occasion to use the highway, with every precaution for their safety that public policy, as fixed by legislation or recognized by adjudication, requires; for these reasons the law imposes upon the corporation a duty to use such precautions; that duty it owes to each person lawfully on its trains, and this independently of any special duty arising from a contract of carriage or employment. *McAdam* v. *Central Ry. & Elec. Co.*, 67 Conn. 445, 447. Each person lawfully on a train has a right to the protection of such precaution, and is entitled to damages for any injury done him in violation of this right. In holding that the rules for the supervision of trains under conditions like those attending the trains in question, fulfilled the legal duty of the defendant, in this respect, and that public policy does not require these rules to prescribe giving telegraphic information in the manner claimed, we necessarily hold that giving such information to these particular trains on the day specified is not a precaution required by public policy and is not a duty imposed upon the defendant by law, and therefore a failure to give such information did not violate any legal right of the plaintiff's intestate.

But the claim is made that the conditions attending trains 474 and 1411 differed essentially from the conditions in general attending trains moving in the same direction, and differed so essentially as to constitute an exceptional case or emergency unprovided for by the general rules, and of a character so peculiar to itself as to throw upon the defendant, or its vice-principal, the train-despatcher, the duty of acting in

view of all these exceptional circumstances as a man of ordinary prudence should act; that the trial court has found that the train-despatcher did not so act; and that such a finding can never be reviewed by this court. This, in truth, is the real ground of the judgment, and the very gist of the question before us.

We think the conditions attending trains 474 and 1411 did not differ essentially from those in general attending trains moving in the same direction, and did not create an exceptional case or emergency unprovided for by the rules; and that the finding of such emergency by the trial court is an inference from the special facts found, reviewable by this court. The conditions in general attending trains moving in the same direction under the rules, without telegraphic information of their relative position, include: all trains, regular and extra, made up in all ways, even to a single engine; trains off their regular time, way freights being commonly behind time; stopping places for trains which are used only occasionally and not at regular intervals; trains moving at all times of day and night, and in all conditions of weather and atmosphere; trains moving at various rates of relative speed. The special facts found, from which apparently the inference of an exceptional case or emergency is drawn, are the following: train 474 consisted of an engine pushing a snow plow; train 1411 was upwards of an hour behind its schedule time; train 1411 stopped to attach three freight cars at Kent Furnace, which is merely a siding where freight trains stop occasionally and at irregular intervals; the rear train when in motion moved at a faster rate of speed than the forward train; the day was very cold and the snow plow threw snow considerably, rendering it difficult for the lookout stationed on the snow plow to see ahead, but just before the accident the plow was not throwing much snow and the lookout could see. We think the conditions shown by these special facts, considered by themselves or in connection with all the special facts found, are within the conditions in general attending trains moving in the same direction; do not constitute an exceptional case or emergency unprovided for

by the general rules; and did not throw upon the defendant, or its train-despatcher, the special duty of keeping the conductors of those trains informed by telegraph of their relative position. No other inference can be legally drawn from the facts. A conclusion from conceded facts drawn by a court in the exercise of its legal judgment, and controlled by the assumption that two and two make five, is just as truly an error in law as if it were controlled by the assumption that an ordinary breach of contract calls for exemplary damages. In the present case the error is not of this palpable kind; as a matter of first impression there is room for hesitation and doubt; but upon full consideration it seems to us that the legal inference is clear, and that in reaching its conclusion the court below, unless influenced by the error involved in its inference that the rules adopted were inadequate, has failed to apply to the facts those settled principles of sound reasoning whose recognition and application are termed the soul of the law.

The plaintiff relies mainly upon the recent case of *Sprague* v. *New York & N. E. R. Co.*, 68 Conn. 345. In that case the plaintiff's intestate was a servant of the defendant, and was killed in a collision between his train and the train moving in the opposite direction, caused by the misconduct of the conductor of the opposite train. The complaint charged the defendant with liability on account of its violation of its duty as master in employing the conductor at fault to run this train, knowing him to be incompetent. Any other violation of duty on the part of the defendant was inseparably entangled with this, the real ground of the action. The main question considered was one of law, as to the use of the admissions of a demurrer overruled upon a hearing in damages. Aside from this our decision turned wholly upon the question whether, upon the facts as stated, we could find error in the conclusions of the trial court, that the conductor was incompetent, that the defendant knew or ought to have known that he was incompetent, and with this knowledge placed him in charge of the train where his incompetency caused the injury. Here the inference of legal liability from

the conclusions of fact as stated, was unquestioned. The finding shows that these conclusions were not inferred from subordinate specific facts found, but depended in part upon the weighing of evidence and credit given to witnesses. This sufficiently appears in the opinion, but more clearly in the record which is not printed in the report. We held that such conclusions were plainly conclusions of fact within the province of the trial court. No question was presented as to a conclusion from specific facts found, where such conclusion is clearly a *non sequitur.* The defendant claimed that the question of its violation of a legal duty by reason of the insufficiency of its railroad management, was a pure question of law. In referring to this claim the opinion holds the question to be irrelevant to the case in hand; and that if the principle claimed is sound, it cannot control emergencies which no system of rules can anticipate and provide for. It is in this connection that the language specially relied on, relative to emergencies, is used. The language must be read in this connection and in view of the circumstances of the case then before us. So read, the language does not establish any principle inconsistent with the views expressed in the present case.

After stating the specific facts found and the conclusions from those facts (which statement is strictly a part of the judgment specially setting forth the facts on which it is founded), the finding states that the defendant claimed, as a matter of law, " that upon the facts in evidence the defendant, having operated its trains under suitable rules and regulations and having properly equipped said trains, had performed its entire duty toward plaintiff's intestate, and the law imposed no higher degree of care than that exercised by it; " and that the court did not pass upon this claim, " except to find as a matter of fact from the evidence submitted, that the defendant did not exercise ordinary care in the operation of these trains, and that ordinary care required additional precautions by way of special orders, to those provided in the rules, for the reasonably safe operation of these trains."

The trial court did not err in refusing to sustain this claim of law, in the terms in which it is phrased; but it did err in inferring from the specific facts found, that it was the legal duty of the defendant to give the telegraphic information mentioned; and for the purposes of review this inference is not a conclusion from the evidence, which, the finding shows, had exhausted itself in producing the conclusions of fact from which the inference was drawn. This error is not raised by the assignment specifying error in the refusal to sustain the claim of law, but is raised by the assignments specifying the reasons why the facts specially set forth do not support the judgment founded upon them. The only function in this respect, of that part of the finding reciting the claim of law made, is to show that the questions as to the legal inferences from the facts found were distinctly raised at the trial and decided adversely to the appellant's claims. The real position of the plaintiff is that the trial court has found the defendant failed to exercise ordinary care under the circumstances of this case ; that the legal liability of the defendant consists in negligence ; that the failure to exercise such care is negligence ; that negligence is a question of fact entirely within the province of a trial court; and therefore the law determining the legal liability of the defendant, was properly found as a fact within the exclusive province of a trial court to determine.

We have already indicated the mistake involved in this position; but it is a mistake so often made and so readily fallen into, through the use of words expressing different ideas without due attention to the particular idea the word as used is intended to express, that we deem it advisable to restate the ground of our decision with special reference to the confusion of ideas that leads to such mistakes.

We are dealing with a practical question of procedure, i. e., upon the process or record before us, what are the alleged errors that this court can review? The answer is briefly and broadly expressed in the saying: "Errors in law can be reviewed; errors in fact cannot." As we have seen, "fact" is a word of many meanings, and the saying is deceptive unless we keep in mind the particular meaning

attached to the word as here used. We have explained that "fact," as here used, denotes those conclusions reached by the trier directly from sifting testimony, weighing evidence and passing on the credit of witnesses,—conclusions which are not within the jurisdiction of this court, and cannot be reviewed or retried on appeal, whatever the process may be; and that it does not denote those inferences drawn by the trial court from the facts ascertained and settled by it as described,—inferences which always involve to some degree the application of rules and principles of law to adjudicated facts, and which may be reviewed whenever the legal process properly presents an alleged error, and we can see that the inference as to which error is alleged is in truth one of this nature. The word, as here used, may possibly have a little broader meaning in some exceptional cases, but this is immaterial to the purpose in hand.

We have also explained that the word "fact," as here used, must be distinguished from the same word when used to denote those matters within the province of a jury. In the latter sense it often denotes the whole question of legal liability which, by the law of jury trial, must in certain cases be settled by a general verdict; and so far as it may be used in connection with jury trials to denote inferences from evidence, as distinguished from inferences from adjudicated facts, it is of necessity used with an imperfect or uncertain meaning. The trial judge, in instructing a jury upon inferences of law, cannot ordinarily know what the inferences from evidence may be, and in all such cases must give his instructions hypothetically, and is limited in this by the consideration that the law of jury trial forbids his giving instructions upon the law in such manner as in truth to invade the province of the jury in drawing inferences from evidence. Whereas in a trial to the court, the judge first adjudicates all the facts, *i. e.*, inferences drawn from the evidence, and puts upon record these facts. The inference from these facts, of legal liability or of the conclusions essential to legal liability, present to us, in a lawful process for that purpose, the questions of law free from the limitations

which hamper a trial judge in instructing a jury upon the same questions. And it must be remembered that while there is in theory a distinction of a fundamental nature between the judicial function exercised in ascertaining facts from evidence, and that exercised in applying to conceded facts the rules of law for the purpose of inferring logical conclusions and legal liability, yet the two functions are essential to the one judicial act of passing judgment, and the precise line of distinction has little, if any, practical importance, except when the exercise of judicial power is divided between two branches of one court, as in a trial by jury, or is divided for the purpose of establishing an appellate court with a jurisdiction pertaining to the judicial function exercised in applying to conceded facts the rules of law, as in the correction of errors in law by this court. In such cases the necessary line of division, although based on a natural distinction in the character of judicial power exercised for the different purposes, may become, as in this case, a practical question of procedure.

Again, it must be remembered that the rule defining the erroneous conclusions of a trial court which this court can review, is and must be of universal application. There is not a different rule for each class of actions. Actions in tort as well as actions in contract, actions to recover damages resulting from intentional wrongs as well as to recover damages resulting from wrongs not intentional, are all subject to the same rule; and actions of tort or contract wherein questions of negligence arise, are subject to the same rule. The mistake in question is largely due to overlooking this, in the confusion caused by a failure to distinguish, when the word " negligence" is used, the precise one of its many meanings intended to be expressed through the particular use. Negligence is frequently used to express the cause of action where a party seeks redress for injury from an unintentional wrongful act. In the nomenclature of the common law this is called a cause of action enforceable by the action of trespass on the case; "trespass," as signifying a passing over or beyond our right, i. e., a transgression or wrongful

act (Bac. Abr. *ad verb.*) ; " trespass on the case," as signi-fying a form of action devised to cover all cases where an actionable wrong is claimed under the particular circum-stances of the case stated. Negligence, so used, is a compara-tively modern term of art, denoting a class of actions grouped under one head for the purpose of study and treatment. It covers the injuries received ; the act done, positive or nega-tive ; the proximate relation of the act to the injury ; the legal rule of liability applicable to the case stated, and the ap-plication of that rule. The numerous definitions of " action-able negligence " attempt to state briefly and comprehen-sively the conditions essential to all of this group of actions. So used, " negligence " has no more relation to the question before us than if the meaning denoted were expressed in the older language of the common law,—those causes of action where the appropriate remedy is an action of trespass on the case to recover damages for an unintentional injury. As re-lated to this meaning and sometimes confused with it, " neg-ligence " is used to denote the conception of moral blame or fault imputed to a person legally liable for the consequences of an unintentional act. This conception of the moral blame which should make one liable for the consequences of his acts, is the foundation of our law of tort, and, in a wider sense, of our whole system of jurisprudence. In the very early stages of English law this element of moral blame, in cases where the conception seemed too subtle for the times, was overlooked, and the innocent cause of a condition re-sulting in injury was held liable for damages to the innocent victim. But the true theory that moral blame is an essential element of legal wrong, was soon fully recognized, largely through the potent and unacknowledged influence of the Roman law. "*Dolus (i. e., injuria quam quis sciens volensque commisit) aut culpa (i. e., omnis protervitas, temeritas, inconsid-erantia; desidia, negligentia, imperitia, quibus citra dolum, cui nocitum est)* ", as used in the Lex Aquilia, and as ap-proximately expressed in our common law by the terms " in-tention or negligence," describe the two phases of the moral blame or fault essential to make the one causing damage legally liable. 2 Austin's Juris. 109.

The body of our law has been developed through the application of this conception to an infinite variety of facts or events. It has its origin in the accepted law of ethics, and the unfolding of its meaning as a legal maxim is confided to the court. Indeed, the highest function of a judge is exercised in holding to a steady and definite course in the application of such a maxim to ascertained facts, whether their conjunction be novel or not. In the exercise of such a function our system of jurisprudence develops under the control of fixed maxims and prior authorities. It is this control of the element of discretion, inherent in the application of a general principle to each new state of facts, that distinguishes the justice administered by a common law judge from that of an oriental Cadi. Whether this primary conception of moral blame is vague or not in itself, the principle of legal liability which in theory it justifies, is certain; the legal liability is not wholly coincident with the moral blame, it depends upon the law (however derived); and that law consists mainly in rules of public policy defining and limiting the rights and duties pertaining to person and property. These rules are ordinarily intended to square with the highest theory of ethics; an intention not always realized. But it is the law and not the theory which determines legal liability. No principle of legal liability which is in the legal sense uncertain,—which is derived, not from settled maxims and authority that must govern every case, but from the unrestrained will of a single man or a dozen men which can govern no other case,—is a legal principle. *Ubi jus incertum, ibi jus nullum.* Negligence, with the meaning under discussion, is a convenient form for denoting the conception of legal blame in a certain class of causes of action, for the purpose of investigating the theory underlying the law which determines liability in such cases. It is a term more useful to the jurist in seeking the theoretical sources of the law, than to the judge in applying positive law to conceded facts. Used in this sense, negligence is largely synonymous with the law of liability in this class of actions (although it hardly covers the whole law of liability in such cases), and denotes a prin-

ciple which is essentially compound, *i. e.*, one which includes a variety of maxims and rules, any or all of which may be involved in its application to particular cases. This use of the word might not have produced the confusion it has led to, were it not that one of the rules covered by the term "negligence," and one most frequently invoked in actions of this character, involves the use of negligence with the primary meaning of the word, and so the considerations peculiar to this single rule have been easily commingled with those applicable when the same word is used, not with its primary meaning, but as a term of art signifying the whole principle of legal liability. Negligence thus used is scarcely distinguishable from heedlessness, and may be shown in omitting to do an act or in doing an act. When the law says a person whose conduct is negligent (in this sense), the other conditions of liability existing, is liable for damages caused by his conduct,—the meaning of "negligent," like the meaning of any material word used in stating a rule of law, is a question of law to be settled by the courts whose province it is to declare the law; and where the rule is intended to apply to an indefinite variety of events, the meaning of the rule in its application to each group of events is a question of law for the court. So it has been held in cases of "reasonable" notice to take a deposition; *Sharp* v. *Lockwood*, 12 Conn. 155, 159; *Sing Cheong Co.* v. *Wing*, 59 id. 535, 543; "reasonable" time for presenting a note for payment; *Lockwood* v. *Crawford*, 18 Conn. 361, 372; "reasonable" or "diligent" search for a lost document; *Kelsey* v. *Hanmer*, 18 Conn. 311, 317; and the principle may be illustrated in other ways. This is elementary law; were it not so, the growth of any stable system of jurisprudence would be far less practicable. No difficulty can arise where the group of events calling for the application is clear and certain. But where, as sometimes happens, the group of events in respect to which the meaning of a word must be declared, are of a nature insusceptible of clear statement, then, while the function of ascertaining facts from testimony and that of applying the law to the facts, should be separately exercised by the trial judge,

yet any adequate separate statement by him in the record of
the results, *i. e.*, the facts as ascertained and the application
of the law to those facts, may be impracticable. Dilemmas
of a similar nature account for most of the troublesome ques-
tions relating to the instruction of a jury by the court. In
a trial to the court, where the two functions are united, there
is no difficulty so far as the disposition of that case is con-
cerned; but inasmuch as a statement of the facts is imprac-
ticable, the application of the law is not apparent, and the
case cannot serve as a precedent, and cannot be reviewed for
error in law by an appellate court.

In a large number of cases the material question is
whether the ascertained conduct of a person is in law negli-
gent, in the sense last indicated. Often the ascertained con-
duct cannot be formulated into a series of adjudicated facts;
it consists of a single impression produced in the mind of
the trier by the whole mass of relevant testimony. That
impression cannot be stated in words; it is a mental view
which language is not luminous enough to photograph. Is
that conduct negligent in law? Clearly the conclusion of
the trier that it is or is not, must be, *quo ad* the trier, a con-
clusion of law; whether it be considered as an inference from
many facts, or as the declaration of the meaning of a rule of
law in relation to a single fact, it is the inference of a legal
wrong from ascertained fact, and that is essentially a con-
clusion of law. Equally clearly the conclusion of the trier
must be, *quo ad* the power of this court to review his infer-
ence, a conclusion of fact. Not because the inference is not
one of law, but because the fact or facts from which the
inference is drawn cannot by any process known to the law
be transferred from the mind of the trier to the mind of the
appellate court. When such a question comes before us we
say we will not attempt to review the conclusion; it is one
of fact; and this, notwithstanding the trial judge has con-
scientiously tried to give in his finding a word picture of a
mental impression that cannot be painted in words. He has
not succeeded; he cannot succeed; the precise legal infer-
ence he has drawn must remain unknown; it cannot, there-

fore, be reviewed, and is practically a conclusion of fact. Now this condition may arise in any kind of action, and is not peculiar to actions of negligence, using the word as a term of art describing a certain class of actions.

The mistake of the plaintiff arises, mainly, from confusing an ascertained fact—where the fact is conduct claimed in law to be negligent,—incapable of transference from the mind of a trial court to that of an appellate court, with the legal inference drawn by the trial court from that fact, and which cannot be reviewed because the appellate court cannot have the fact from which the inference is drawn, before it, and then applying the practical result of such a condition to the inference of liability in all actions classed under the term actions of negligence. And this confusion arises mainly from the fact that the word negligence, as used in respect to the same general subject, has entirely distinct, although closely related, meanings, dependent on the particular purpose for which it is used. A similar confusion arises from the use of " ordinary care," which is used sometimes in reference to actual conduct under circumstances, as found by the trier, incapable of being so formulated in a finding as to state the facts really adjudicated, and show the inference actually drawn, and sometimes as indicating the rule of legal liability under any given state of facts ; as used in the latter sense it may denote the ultimate ground of every cause of action.

In the present case we hold that the inference of legal liability drawn by the trial judge, is reviewable, because the events upon which the cause of action arises are of such a nature that they can all be fully and clearly found by a trial court as adjudicated facts, and have been so found and properly appear before us in the record ; that the conclusion of the trial court of an " emergency," which required of the defendant a line of conduct appropriate only to the single transaction in question, is reviewable, because this subordinate conclusion is drawn from adjudicated facts fully and clearly found in compliance with existing law of procedure, and the trial court in reaching the conclusion—unless the law defining such an emergency was misapplied—has plainly

mistaken those rules of sound reasoning whose observance is essential to the validity of an inference from admitted facts.

In stating our conclusion we have not sought to lay down a binding rule, but have merely endeavored to explain, as far as the infirmities of language will permit, the test of our decision in this case. We believe that such a test if applied, with discrimination as to the circumstances of each case, to the whole line of our decisions where the question of reviewability of errors alleged in inferences of trial courts has arisen, will reconcile those cases as resting on a ground substantially the same in all. This question was very carefully considered in *Farrell* v. *Waterbury Horse R. Co.*, 60 Conn. 239. The opinion of JUDGE TORRANCE in that case touches *cum acu* the root of the difficulty; and has been our main guide in subsequent decisions. The underlying principle was there considered with special reference to contributory negligence, where the ascertained fact could not be stated in the finding, and so the inference of the trial court could not be reviewed, and remained for all practical purposes a conclusion of fact. In this case we consider the same principle with special reference to the question of legal liability, where the adjudicated facts can be and are fully set forth. And the task of testing the principle is now of a somewhat different nature and easier than it was then, by reason of further changes in procedure and our decisions upon the effect of such changes, in enlarging the facilities for the full exercise of our jurisdiction in correcting the erroneous inferences of a trial court.

We allude to some matters suggested by the record merely to avoid any implication from a failure to mention them. It is claimed that one or two of the facts stated, as found from the evidence, are in reality nothing but deductions from the rules or from other facts found, and as such erroneous. The facts referred to have too slight a relation to the controlling question to call for particular comment. As a whole the finding is exceptionally full and clear ; and furnishes proper facility for its correction in the matters complained of, were such correction necessary.

It is claimed that the court erred in its conclusion that the

injury resulted from the combined negligence of the brakeman Hall and the defendant. The Massachusetts case of *Hayes* v. *Western R. Corp.*, 3 Cush. 270, apparently supports this claim. As we hold that the court erred in finding the defendant negligent, otherwise than by reason of the fault of its brakeman, the question is not material and we do not pass upon it.

The court finds that " the employees of the defendant occasionally violated this rule (the one whose violation by the brakeman caused the collision) and the conductor in charge of 1411 knew this." If there were other facts in connection with this, clearly showing that the rule was not enforced through the neglect of the defendant, a different question would arise in respect to its liability. The duty imposed by law upon the defendant is not fulfilled by merely adopting adequate rules. The law imposes upon it a duty in respect to the enforcement of rules necessary for the protection of the public. This question was considered in *Gerrish* v. *New Haven Ice Co.*, 63 Conn. 9, 16, and is discussed in *Railway Co.* v. *Hammond*, 58 Ark. 324, 332. It is not raised in this case.

The judgment under review is controlled by the conclusion that the collision in which Nolan was killed, was caused by the legal negligence of the brakeman Hall in conducting the business of the defendant; and that the defendant escapes liability solely on the ground that Nolan, the victim of the wrong, as well as Hall, through whom the injury was done, was its employee. The rule which produces such a result is too firmly established as law by a multitude of decisions to be now reversed or seriously modified by any exercise of the power vested in courts.

There is error; the judgment of the Superior Court is set aside and the case remanded for assessment of nominal damages.

In this opinion the other judges concurred.

NOTE:—The rule (of co-employee) is one deduced by a process of analogy from decisions rendered under a state of society very different from that of to-day; and the crystallization of such analogies into a

binding rule is of comparatively modern origin. It first appeared in England in *Priestley* v. *Fowler*, 3 Mee. & Wels. 1 ; and in 1850 was applied to the employees of railroad companies, in *Hutchinson* v. *York N. & B. Ry. Co.*, 5 Exch. 343. In 1841 it was formulated in South Carolina ; *Murray* v. *Railroad Company*, 1 McMullan, 335 ; and in 1842 in Massachusetts, in the leading case of *Farwell* v. *Boston & W. R. Corp.*, 4 Metc. 49. The very able opinion of CHIEF JUSTICE SHAW in the last case, has largely dominated the law on this subject during the past fifty years, and contains the most plausible statement that can be given of the grounds supporting the public policy which compels a workman entering the service of a master to assume the whole risk of any injury that may be done him by the master through the misconduct of a fellow-servant. The vigorous language of this statement, however appropriate it may have been at that time, has a touch of grim irony when read in the light of existing conditions in the employment of labor. In England, in 1880, the rule was changed by the "Employers' Liability Act," and is now practically abolished as to large classes of workmen, by the "Workmen's Compensation Act" passed during the present (1897) year. The rule has been dealt with by legislation in several of our sister States. It was first formally recognized in this State in *Burke* v. *Norwich & W. R. Co.*, 34 Conn. 474, 479, with a strong protest against the sufficiency of the grounds for a principle deemed too firmly settled in other jurisdictions to be differently treated here. In *Darrigan* v. *New York & N. E. R. Co.*, 52 Conn. 285, the application of the rule was somewhat modified, and possibly cases may arise where the legitimate exercise of the duty of the court in applying established principles to novel conditions, may involve some limitations of its apparent reach. But the evil is too deep seated to be remedied by judicial action ; it needs radical treatment through wise legislation.

W. H.